Kathryn C. ROLLINS, Plaintiff–
Appellant,

v.

Larry G. MASSANARI,* Acting Com-
missioner of Social Security Admin-
istration, Defendant–Appellee.

No. 99–55977.

United States Court of Appeals,
Ninth Circuit.

Submitted Feb. 12, 2001 **

Filed Aug. 17, 2001

---

* Larry G. Massanari, Acting Commissioner of the Social Security Administration, is substituted for his predecessor pursuant to Fed. R.App. P. 43(c)(2).

** The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2)(C).

---

Bertram L. Potter, Pasadena, California, for the plaintiff-appellant.

Peter O. Okin, Assistant Regional Counsel, Social Security Administration, San Francisco, California, for the defendant-appellee.

Before: FERGUSON, TASHIMA, and FISHER, Circuit Judges.

TASHIMA, Circuit Judge:

Kathryn C. Rollins appeals from the district court's grant of summary judgment in favor of the Commissioner of the Social Security Administration, affirming the Commissioner's denial of Rollins' application for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 401–433. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I. BACKGROUND

Rollins was injured in a car accident in August 1992. Since then, she has experienced pain in her muscles and joints, primarily in her neck and shoulders, but also in her legs, hips, arms, and wrists. She also testified that she suffers from fatigue and stress or depression, mainly from dealing with her pain.

In 1994, a rheumatologist, Dr. Carol Young, diagnosed Rollins as suffering from fibromyalgia, a syndrome that has been widely recognized in the medical community for only about 10 years. As the Seventh Circuit has explained,

[fibromyalgia's] cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and "the only symptom that discriminates between it and other diseases of a rheumatic character" multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.1996). When examined, Rollins was found to have all 18 possible tender spots.

Rollins' application for disability benefits was denied after a hearing before an administrative law judge (ALJ). The Appeals Council of the Social Security Administration Office of Hearings and Appeals subsequently denied review, making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 404.981. Rollins then sought judicial review in federal district court and consented to have her case heard by a magistrate judge. The parties filed cross motions for summary judgment, and the court ruled in favor of the Commissioner. This timely appeal followed.

## II. STANDARD OF REVIEW

■ We review de novo the district court's order upholding the Commissioner's denial of benefits. *Harman v. Apfel,*

211 F.3d 1172, 1174 (9th Cir.2000). We must affirm the decision of the Commissioner if it was supported by substantial evidence in the record and applied the correct legal standards. *Reddick v. Chater,* 157 F.3d 715, 720 (9th Cir.1998). Substantial evidence must be more than a scintilla, but it need not amount to a preponderance. *Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir.1998).

## III. DISCUSSION

### A. Dr. Young's Reports

■ Rollins argues that the ALJ erred by rejecting various statements made by Rollins' treating physician, Dr. Young. The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing "specific and legitimate reasons" supported by substantial evidence in the record. *Reddick,* 157 F.3d at 725.

The ALJ provided adequate reasons for not fully crediting Dr. Young's statements. For example, he noted that on October 4, 1994, Dr. Young claimed that Rollins was disabled, despite the facts that (1) Dr. Young also claimed that Rollins had improved since her original examination on July 25, 1994, and (2) Dr. Young's findings at the July 25 examination indicated that Rollins was not disabled.

These reasons are supported by substantial evidence. On July 25, Dr. Young described Rollins as a "[w]ell developed, well nourished middle aged female in no acute distress" and prescribed a conservative course of treatment, including a recommendation to "avoid strenuous activities." These are not the sort of description and recommendations one would expect to accompany a finding that Rollins was totally disabled under the Act.

In addition, the ALJ noted that some of Dr. Young's recommendations were so extreme as to be implausible and were not supported by any findings made by any doctor, including Dr. Young. In particular, Dr. Young claimed that Rollins' condition prevented her from engaging in *any* bending, stooping, crouching, crawling, kneeling, climbing, and balancing, and also indicated that Rollins should *never* be exposed to any smoke, fumes, dust, temperature extremes, humidity, vibrations, or noise, among other things. There is no indication in the record what the basis for these restrictions might be, and Rollins herself has never claimed to have any problems with many of the conditions and activities that Dr. Young instructed her to avoid. Moreover, the restrictions appear to be inconsistent with the level of activity that Rollins engaged in by maintaining a household and raising two young children, with no significant assistance from her ex husband.

In sum, the ALJ provided adequate reasons, under the appropriate legal standard, for finding that Dr. Young's opinion was not controlling.

### B. Rollins' Testimony

■ Rollins argues that the ALJ improperly assessed the credibility of her testimony regarding the severity of her pain and the degree to which it incapacitates her.

■ "[O]nce a claimant produces objective medical evidence of an underlying impairment, an [ALJ] may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir.1991) (en banc). If the ALJ finds the claimant's pain testimony not to be credible, the ALJ "must specifically make findings that support this conclusion," and the findings "must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected the claim-

ant's testimony on permissible grounds and did not arbitrarily discredit [the] claimant's testimony." *Id.* at 345 (internal quotation marks omitted). If there is no affirmative evidence that the claimant is malingering, the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony regarding the severity of symptoms. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir.1998).

Assuming, without deciding, that fibromyalgia does constitute a qualifying "severe impairment" under the Act, we nonetheless conclude that the ALJ stated sufficient specific reasons for not fully crediting Rollins' pain testimony. For example, the ALJ noted that when Rollins was discharged from the Behavioral Medicine Center of Loma Linda University Medical Center after treatment for addiction to painkillers, the doctors discharging her said that she had "no restrictions on activity" and gave her a Global Assessment of Function level of 70, "indicating only mild symptoms and generally quite adequate function." While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects. 20 C.F.R. § 404.1529(c)(2). The ALJ also pointed out ways in which Rollins' claim to have totally disabling pain was undermined by her own testimony about her daily activities, such as attending to the needs of her two young children, cooking, housekeeping, laundry, shopping, attending therapy and various other meetings every week, and so forth. For example, in her daily activities questionnaire, Rollins stated that she attended to "all of [her] children's needs; meals, bathing, emotional, discipline, etc." because her husband worked six days a week, usually from early in the morning until 10 p.m. In the same questionnaire, she also stated that she left the house "daily" to go to places such as her son's school, taekwondo lessons and soccer games, doctor's appointments, and the grocery store.

It is true that Rollins' testimony was somewhat equivocal about how regularly she was able to keep up with all of these activities, and the ALJ's interpretation of her testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it. *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir.1989).

Consequently, we reject Rollins' argument that the ALJ improperly discounted her testimony. The ALJ gave clear and convincing reasons for discounting portions of Rollins' excess pain testimony, and those reasons were supported by substantial evidence.

**C. The Vocational Expert**

Rollins argues that the ALJ erred in framing his hypothetical questions for the vocational expert, because the questions did not include all of the limitations caused by her pain. The omitted limitations, however, were only those that the ALJ found did not exist. Because the ALJ included all of the limitations that he found to exist, and because his findings were supported by substantial evidence, the ALJ did not err in omitting the other limitations that Rollins had claimed, but had failed to prove.

**D. Bias**

Rollins argues that the ALJ exhibited improper bias against her.

Rollins' argument is without merit. "ALJs and other similar quasi-judicial administrative officers are presumed to be unbiased. This presumption can be rebutted by a showing of conflict of

interest or some other specific reason for disqualification." *Verduzco v. Apfel,* 188 F.3d 1087, 1089 (9th Cir.1999) (citation and internal quotation marks omitted). It is true that the ALJ's remarks occasionally exhibited sarcasm or impatience, particularly with respect to Dr. Young's reports. But "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women ... sometimes display" do not establish bias. *Liteky v. United States,* 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Rather, Rollins was required to show that the ALJ's behavior, in the context of the whole case, was "so extreme as to display clear inability to render fair judgment." *Id.* at 551, 114 S.Ct. 1147. Rollins has pointed to nothing in the record that rises to this level.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**

FERGUSON, Circuit Judge, dissenting.

I respectfully dissent for the reasons that the majority glosses over the record and attempts to reintroduce a standard that an *en banc* panel of this Court unequivocally rejected ten years ago. In doing so, it reaches a conclusion contrary to the testimony of the vocational expert.

It is axiomatic that "[o]nce the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir.1995). *See also Light v. Soc. Sec. Admin.,* 119 F.3d 789, 792 (9th Cir.1997); *Bunnell v. Sullivan,* 947 F.2d 341, 343 (9th Cir.1991) (*en banc*). While the majority claims that it bases its decision on both

Rollins' credibility and the medical record, I cannot believe this is possible.

Kathryn Rollins has fibromyalgia. No one in this case has seriously contested this fact, and even the ALJ acknowledged that she has it. The District Court properly treated any argument that Rollins was not impaired as waived. *See Meanel v. Apfel,* 172 F.3d 1111, 1115 (9th Cir.1999). Although the majority suggests that fibromyalgia may not qualify as a underlying impairment for their subjective pain analysis, this Court has held otherwise a number of times. *See, e.g., Harman v. Apfel,* 211 F.3d 1172, 1178–79 (9th Cir.2000); *Bunnell,* 947 F.2d at 342, 347. Nor have we been the only circuit to find that fibromyalgia is a qualifying impairment for which subjective pain testimony may be considered. *See, e.g., Sarchet v. Chater,* 78 F.3d 305, 306–07 (7th Cir.1996); *Kelley v. Callahan,* 133 F.3d 583, 585 n. 2 (8th Cir. 1998); *Lisa v. Sec'y of Dept. of Health & Human Servs.,* 940 F.2d 40, 44–45 (2nd Cir.1991); *Preston v. Sec'y of Health & Human Servs.,* 854 F.2d 815, 817–18 (6th Cir.1988) (per curiam).

Fibromyalgia, also known as fibrositis, is a "type of muscular or soft-tissue rheumatism that affects principally muscles and their attachment to bones, but which is also commonly accompanied by fatigue, sleep disturbances, lack of concentration, changes in mood or thinking, anxiety and depression." *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech., Inc.,* 125 F.3d 794, 796 (9th Cir.1997) (citing *Fibromyalgia,* Arthritis Foundation Pamphlet at 1, 5 (1992)). These symptoms comport entirely with Rollins' subjective complaints.

## I. Standard of Review

The majority confuses our standard of review. It is true that we must uphold the Commissioner's decision to deny benefits if

it is supported by substantial evidence. However, once the claimant has met her burden of showing that she has been diagnosed with a medical impairment that could cause her symptoms, then "[u]nless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'" *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir.1998) (citing *Lester,* 81 F.3d at 834). This is not a new or obscure standard. *See Holohan v. Massanari,* 246 F.3d 1195, 1202 (9th Cir.2001); *Morgan v. Comm'r of the Soc. Sec. Admin.,* 169 F.3d 595, 599 (9th Cir.1999); *Regennitter v. Comm'r of the Soc. Sec. Admin.,* 166 F.3d 1294, 1296 (9th Cir.1999); *Light,* 119 F.3d at 792; *Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir.1996); *Johnson v. Shalala,* 60 F.3d 1428, 1433 (9th Cir.1995). There is no evidence of malingering here, and the justification offered by the ALJ, and adopted by the Commissioner, is not "clear and convincing."

## II. Rollins' Testimony

Rollins clearly demonstrated that she has "an underlying impairment which is reasonably likely to be the cause of alleged pain." *Bunnell,* 947 F.2d at 343. Moreover, her medical reports contain specific findings that she is not malingering, and no contrary evidence was introduced. As a result, "the adjudicator may not discredit [her] allegations of the severity of pain solely on the ground that the allegations are unsupported by objective medical evidence." *Id.; see also Lester,* 81 F.3d at 834. Instead, the ALJ must discredit the claimant's subjective testimony by finding that she is not credible.

### A. Credibility

The ALJ's rejection of Rollins' testimony was in error. "To find the claimant not credible the ALJ must rely either on reasons unrelated to the subjective testimony (*e.g.,* reputation for dishonesty), on conflicts between [her] testimony and [her] own conduct, or on internal contradictions in that testimony." *Light,* 119 F.3d at 792. Although we give deference to the ALJ in determining a claimant's credibility, an ALJ cannot seek to justify negative credibility findings by "ignoring competent evidence in the record that suggests an opposite result." *Gallant v. Heckler,* 753 F.2d 1450, 1456 (9th Cir.1984). That is exactly what happened in this case.

An ALJ must specifically identify "what evidence undermines the claimant's complaints." *Lester,* 81 F.3d at 834. *See also Embrey v. Bowen,* 849 F.2d 418, 423 (9th Cir.1988). The ALJ stated that Rollins' complaints were not reflected in her daily activities and were too "vague." A review of the full record, however, reveals a very different picture than the conclusory sketch drawn by the ALJ.

An ability to keep to an 8–hour a day, 5–day a week schedule without accumulating too many absences is a pre-requisite for many jobs. It therefore is a factor in determining a claimant's residual functional capacity. SSR 96–8P. *See also* 20 C.F.R. §§ 404.1512(a) and 416.912(a); *Reddick,* 157 F.3d at 724 (holding that it was legal error for ALJ to fail to take into account claimant's capacity to "undertake sustained work activity"). Rollins testified that her pain and fatigue were too severe to enable her to keep a regular 40–hour work schedule; the ALJ disagreed, opining that Rollins' daily activities belied her complaint. While it is true that the activities that the ALJ listed comport with the lifestyle of a relatively healthy individual, he did not list the activities that Rollins actually described.

Rollins is now a single mother of two boys. The ALJ, in rebutting her pain testimony, wrote that "she did the cooking, light housekeeping, laundry, shopping,

drove the children to school·occasionally, and when they were in sports, drove them to their practices and games, and went to their games." In fact, Rollins testified that she rarely cooked and then usually only frozen foods or hot dogs; that the only housework she did was the dishes and even this she is unable to complete two or three nights a week; that it takes her almost two hours to make it through the grocery store and she requires help unpacking her cart and getting her bags to the car; and that during her bad days she could not drive her children to sports and a neighbor would do it or the children would miss their game. None of this contradicts her statements about being in extreme, though fluctuating, pain.[1]

The ALJ also found probative the fact that Rollins attended tri-weekly AA meetings, monthly pain management meetings, and church every other week and that

Rollins "appears to be capable of meeting all these various temporal commitments on a regular, recurring basis."[2] Again, this is not what Rollins testified. Instead, she said that she was often in too much pain to go to church and that the last time she went she had only lasted 30 to 45 minutes of an hour and a half service; that sometimes she has to leave the AA meetings because it is too painful to sit;[3] and that when she is having a "bad day" she is unable to drive to the doctor's office. She testified that she had to stop her extra activities such as being a "room mom" and "te[am] mom" due to her pain and fatigue. Contrary to the ALJ's portrait of Rollins as capable of single-handedly caring for her two boys, she also testified that on days when she has debilitating migraines her children either take care of themselves or a neighbor or her ex-husband helps out.[4]

1. Rollins described the inconsistency of her pain as one of its most limiting aspects:

   Well, I can wake up one morning and I can just be like totally [gung] ho, thinking I'm going [to] do all these things and then once I get going I either get [too] fatigue[d] or the muscle spasms start to get worse and it's just, it totally fluctuates and it's not that I can like do my, do work according[ly] and think, well, okay, I'm going to go here tomorrow so I think I'll take it easy today because I might wake up and hurt more or I might do more and wake up and feel better. It's like totally inconsistent.

2. I find problematic the ALJ's reliance on Rollins' attendance of pain management classes and AA meetings in making his credibility determination. We have held that "an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" may negatively affect a claimant's credibility determination. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989). *See also* 20 C.F.R. §§ 404.1529(c) and 416.929(c). Rollins, in contrast, made a good faith effort to get treatment and cope with her illness. Penalizing her for that creates a "damned if you do, damned if you don't" choice not anticipated by the regulations or case law.

3. Rollins began attending AA as a result of her addiction to pain killers, not alcohol. She spent six weeks in Loma Linda University Behavioral Medicine Center for drug dependence in 1995.

4. Rollins' friend and neighbor submitted a statement that supported Rollins' description of her daily life (*i.e.*, "She has bad days and the pain she feels causes her not to be able to stay focussed. [sic] She forgets things sometimes. It's difficult for her to 'keep it all together.' There are times in our conversation when she 'gets lost.' ... I cannot picture her, at this time, holding down an 'outside' job. I think it would be way too much for her to handle."). We have held that such information should factor into the ALJ's calculation. *Smolen*, 80 F.3d at 1288. *See also* 20 C.F.R. §§ 404.1513(e)(2) and 416.913(e)(2); SSR 88–13 (requiring the adjudicator to obtain detailed descriptions of daily activities where claimant alleges excessive pain). Although the ALJ did not reject this testimony, he cited this five-page statement only once, and then for the proposition that responsibilities around the home fell to Rollins. In fact, the friend described Rollins' household responsibilities in the context of explaining how difficult it was for Rollins to cope with them.

There was also credible medical evidence that Rollins suffers from migraine headaches that keep her in bed once or twice a month. The ALJ said that her complaints were "vague." On the contrary, her testimony was that she has good days and bad days, and on the truly bad days she spends most of the day in bed. She also testified clearly that two or three days a week she is too tired to function properly and spends most of the day in bed. I do not see how her testimony on either of these areas was vague.[5]

In short, the ALJ's rejection of Rollins' testimony is neither "clear" nor "convincing." Instead, "[t]here is considerable evidence in the record that detracts from the ALJ's conclusions." *Reddick*, 157 F.3d at

723. *See also Holohan*, 246 F.3d at 1203–05 (reversing adverse credibility finding where ALJ selectively quoted doctor's records out of context). The ALJ did more than simply weigh the evidence; he instead completely recharacterized Rollins' testimony. Rollins' account of her daily life is, in essence, the story of attempting to function through severe, fluctuating pain. Every aspect of her life relied on by the ALJ to refute her pain testimony was in fact offered to demonstrate the accommodations her pain and fatigue have forced her to make.[6]

In ignoring these accommodations, the ALJ essentially penalizes Rollins for making an effort to cope with her pain and be a mother to her sons. The Social Security

---

**5.** The following are excerpts from Rollins' hearing before the ALJ:

Q: Well, now, how often do you have days, bad days where you have to lay down in the bed?
A: Two to three ...
. . .
Q: Is it your testimony that you have bad days two to three times a week?
A: Yes.
. . .
Q: And how many headaches have you had this year where you've treated them with cataflan?[sic]
. . .
A: Average one a week.
Q: When you have the cataflan [sic] headache, how long do they last?
A: A day, sometimes two.
Q: Now, when you're having those headaches, what impact does it have on your ability to take care of your children or yourself?
A: It depends on how [severe] it is. If it's like a full blown migraine then I have to lay in bed but I'm always pushing myself all the time to just keep going.
Q: How many times have you had the lay in bed migraines this year?
A: I don't know, maybe twice a month
Q: Who takes care of your boys if you have that intensive headache?
A: They are, they have to like [stay] in the [house] or play in the backyard and they

kind of [fend] for themselves or á neighbor will come over or if [Juan], that's my husband, he comes over.
. . .
Q: Do you know, are you able to predict when you're going to have those two lay down type headache[s]?
A: No. No.
Q: Does that just take you down for two days?
A: Sometimes not even two days.
This testimony is not "vague" at all. As the ALJ gave no facts to support his conclusion that this testimony is "vague," we cannot uphold his determination. *See Holohan*, 246 F.3d at 1208.

**6.** I agree with the majority that Dr. Young's reports are contradictory and therefore not wholly credible. That Dr. Young's restrictions were extreme does not and should not impact the Court's evaluation of Rollins' testimony, however. Indeed, a review of all the doctors' reports indicates that Rollins has been remarkably consistent in her complaints and active in seeking help for them. Dr. Young's diagnosis of fibromyalgia has not been challenged; the only question before this Court is the degree of Rollins' subjective pain, and therefore Rollins testimony is highly probative. Rollins should not be punished for the overzealous limitations of her doctor.

system was not designed to provide a disincentive for disabled individuals to struggle to improve and function. Yet that is exactly the approach that the majority today apparently endorses. If Ms. Rollins had refused to care for her sons after her husband left her, or if she were not active in seeking out the support of her church, AA, and pain management groups, then the ALJ could not have asserted that her daily activities undermine her credibility. She is being punished for trying.

Other details from the record bolster confidence in Rollins' credibility. She has undergone a number of difficulties in life, including significant abuse, two broken marriages, migraines, and depression. None of these factors slowed her down until August 1992, when she was broadsided by a truck and subsequently diagnosed with fibromyalgia. Indeed, prior to the birth of her second child in 1989, she worked for 13 years in a bank with good performance reviews. She has consistently and actively sought help and treatment for her ailments. She was specifically found not to be malingering. She has been cooperative with her doctors and was forthcoming at her hearing before the ALJ. Cf. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir.2001) (upholding adverse credibility finding where ALJ cited claimant's "lack of cooperation at the hearing, her presentation at the hearing, her tendency to exaggerate, her inconsistent statements, and her lack of cooperation during consultative examinations").

In short, there is nothing in the record to indicate that this is a woman who gives up when the going gets tough. Rollins' closing statement to the ALJ is remarkable:

It's not my intention to stay disabled [all] my life and believe me I don't want to be disabled ... That's [why] I go to the groups ... and, as you can see, nobody even told [me to go to them.] I

went to my doctor and I said, "You know what, I need to get help. I don't want to live like this." ... [I]t's the truth and you can look at my, if you can look at me and my past and how I functioned before the accident. I did every single sport there was. I did every man thing there was. I fixed the car. I, I fixed the backyard and I've gone from being a total performer to being the way I am now and what I am trying to [do] now is survive and try to get help for my kids and every day is a struggle, everyday....

## B. Objective Medical Evidence

Rollins' testimony comports with the symptoms associated with fibromyalgia, and none of her testimony is contradictory. The ALJ erred in determining that Rollins was not credible. Because objective medical evidence cannot be the sole basis for rejecting pain testimony, this evidence is of little import where a medical condition is proven and the claimant is credible. *Light*, 119 F.3d at 792.

Despite this well-worn precedent, the majority reaches the cursory conclusion that substantial evidence supported the ALJ, despite the fact that the ALJ repeatedly misrepresented Rollins' testimony. I can only conclude that it rejected Rollins' pain testimony based almost entirely upon the absence of objective medical evidence to confirm the degree of her pain. This is problematic for two reasons.

First, we have already rejected an approach that "requires objective medical evidence to corroborate the severity of the pain alleged." *Bunnell*, 947 F.2d at 343 ("We reject this standard because it is inconsistent with the relevant statutory language, the legislative history, the Secretary's regulations, [and] the Secretary's interpretation of the regulations...."). The regulation cited by the majority

stands for the unremarkable proposition that a claimant's symptoms must have a medical cause. Indeed, the regulations specifically prohibit rejecting subjective pain testimony solely on the basis of objective medical evidence. 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2).

Second, the scarcity of objective medical evidence in this case is probative only of the majority's lack of understanding of fibromyalgia. One of the most striking aspects of this disease is the absence of symptoms that a lay person may ordinarily associate with joint and muscle pain, as noted in medical texts on the illness:

> Patients with FMS [ (fibromyalgia syndrome) ] usually look healthy. Their joints appear normal, and further musculoskeletal examination indicates no objective joint swelling, although there may be tenderness on palpation. In addition, muscle strength, sensory functions, and reflexes are normal despite the patient's complaints of acral numbness.
>
> The most striking and unique finding in FMS is the presence of multiple tender points. Blind studies have established that these tender points are both quantitatively and qualitatively different from those observed in healthy persons and in those with other chronic pain conditions.... Patients with FMS not only hurt more, but they also hurt in many more places than other patients.

Muhammad B. Yunus, *Fibromyalgia syndrome: blueprint for a reliable diagnosis,* Consultant, June 1996 at 1260. The most clear objective medical indication of fibromyalgia is tenderness at at least eleven of eighteen specific points on the body. Rollins was found to be tender at all eighteen. I do not know what additional evidence the majority hoped to find. *See Sarchet,* 78 F.3d at 307 ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostrate cancer is not advanced.").

### III. The Vocational Expert

The hypotheticals posed to the vocational expert were tainted by the ALJ's adverse credibility determination. A hypothetical posed to a vocational expert must contain "*all* of the limitations and restrictions" that are supported by substantial evidence. *Magallanes v. Bowen,* 881 F.2d 747, 756 (9th Cir.1989) (quoting *Embrey,* 849 F.2d at 422) (emphasis in original). Although the ALJ properly found that the limitations proposed by Dr. Young were not supported by substantial evidence, he improperly excluded from his hypothetical Rollins' testimony of pain and fatigue that demonstrate she can neither perform a regular 40–hour work week nor attend work regularly. The ALJ improperly discredited Rollins' testimony without providing a clear and convincing reason for doing so.[7]

---

7. Also problematic is the ALJ's reliance on the grids in determining that, even if Rollins could not perform her past relevant work, there were still jobs in the national economy for her to perform. Where a claimant has a non-exertional impairment such as extreme pain, her case cannot be resolved by a simple application of the grids. *Tackett v. Apfel,* 180 F.3d 1094, 1101–02 (9th Cir.1999). "The ALJ may rely on the grids alone to show the availability of jobs for the claimant 'only when the grids accurately and completely describe the claimant's abilities and limita-

tions.' " *Id.* at 1102 (quoting *Jones v. Heckler,* 760 F.2d 993, 998 (9th Cir.1985)).

The ALJ claims that he relied on the grids only for "guidance" and "support." If this were true, it would be proper, but I am not convinced that it is. Although the ALJ cites the vocational expert's testimony as additional support, he does not indicate that he is relying on it. Moreover, the vocational expert was not asked to take Rollins' pain into account in the hypotheticals that the ALJ relied upon. *See Penny v. Sullivan,* 2 F.3d 953, 958–59 (9th Cir.1993) (holding that when pain

The ALJ asked the vocational expert whether Rollins' stated ability to stand in one place for 15 minutes, walk two blocks, lift items such as milk cartons or laundry baskets, and sit for 20 to 30 minutes at a time would preclude competitive employment. The vocational expert answered that this would preclude Rollins from performing either her past skilled or other unskilled work. The vocational expert also stated that the fact that Rollins is unable to function "two to three days a week at unpredictable times" would in itself preclude competitive employment.

Although it is left to our discretion whether to remand for benefits or for further proceedings, "[w]e have repeatedly held that a remand for further proceedings is unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to award benefits." *Holohan*, 246 F.3d at 1210 (citing *Reddick*, 157 F.3d at 728; *Ghokassian v. Shalala*, 41 F.3d 1300, 1303 (9th Cir.1994); *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1399 (9th Cir.1988)). The testimony of the vocational expert was that Rollins was not gainfully employable at that time.

I would therefore remand for an award of benefits.

takes a case out of the grids, the ALJ should call upon a vocational expert for help making the disability determination).