Vicki JORDAN, Plaintiff–Appellant,

v.

NORTHROP GRUMMAN CORPORA-
TION WELFARE BENEFIT PLAN;
Metropolitan Life Insurance Compa-
ny, Defendants–Appellees.

No. 99–56346.

United States Court of Appeals,
Ninth Circuit.

Submitted May 30, 2003.*

Filed June 1, 2004.

---

* The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2). We withdrew this case from submission on October 17, 2001, to await the Supreme Court's decision in *Delta Family–Care Disability and Survivorship Plan v. Regula,* 539 U.S. 901, 123 S.Ct. 2267, 156 L.Ed.2d 109 (2003) (mem.), which vacated and remanded for consideration of *Regula v. Delta Family–Care Disability,* 266 F.3d 1130 (9th Cir.2001), in light of the decision in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), which also originated in this court. We waited to decide this case until the *Nord* panel interpreted the Supreme Court decision after remand.

Thomas W. Falvey (briefed), Pasadena, CA, for the appellant.

Diana Tabacopoulos, Thomas R. Kaufman (briefed), Seyfarth Shaw, LLP, Los Angeles, CA, for the appellees.

Before D.W. NELSON, O'SCANNLAIN, and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

This case turns on whether the administrator of an ERISA disability plan abused her discretion.

Jordan worked as a senior administrative secretary for Northrop Grumman from 1984 to 1995. She described her job as "typing, filing, telephone, sitting, walking, standing, general administrative office procedures." One of her fringe benefits was long term disability insurance under Northrop's company plan for employees. In September 1995, at age 42, she made a written claim for disability benefits under the plan. She wrote that she had pain that interfered with performing her job: "With my present disability it is extremely pain [sic] to sit, stand & walk for any period. My hands & fingers are very, very sore achy painful and prevents [sic] me from performing my every day secretarial functions. I am also experiencing lower back pain & swollen feet & leg pain/numbness." She stated that her disability was fibromyalgia, had begun in May, and that she was receiving "state disability." Additionally, she wrote that, "I'm a single parent. It is very, very difficult trying to meet my present obligations with the income that I am presently receiving from state disability. I would appreciate any help that can be provided to meet my monthly income before this disability started & I was not able work [sic]." She stated that her monthly income before disability was $2,900 and that it was now reduced to $1,344 in state disability benefits.

The plan was issued and administered by The Travelers Insurance Company (Travelers), and subsequently by its successor in interest, Metropolitan Life Insurance Company (MetLife). The plan obligates MetLife to pay monthly benefits "if you become Totally Disabled." Generally, the employee must be absent from work and under a physician's care because of total disability for six consecutive months before benefit payments start. For a person Jordan's age, payments would continue until age 65 so long as she remained totally disabled. Under the plan, the term

"totally disabled" means "unable to perform all the normal duties of your regular occupation" for the first 18 months and "completely unable to engage in any occupation or employment for which you are or become qualified" after that. If a claim is denied, the applicant is entitled to have the claim reviewed by the plan administrator. The plan expressly confers discretion on the plan administrator, both to construe the terms of the plan and to make factual determinations:

> The Travelers will serve as the final review committee under the Plan to determine for all parties all questions relating to the payment of claims for benefits under the Plan and shall notify you in writing about the decision on your review. The Travelers has the discretion to construe and interpret the terms of the Plan and the authority and responsibility to make factual determinations.

Jordan claims that the illness that totally disables her is fibromyalgia. This syndrome, formerly called fibrositis, has traditionally been used for "an ill-defined, poorly understood set of symptoms, consisting of aching pain and stiffness in one or several parts of the body."[1] As we have previously explained, fibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.[2] There are no laboratory tests for the presence or severity of fibromyalgia. "The 'consensus' construct of fibromyalgia identifies the syndrome as associated with generalized pain and multiple painful regions .... Sleep disturbance, fatigue, and stiffness are the central symptoms," though not all are present in all patients.[3] The only symptom that discriminates between it and other syndromes and diseases is multiple tender spots, which we have said were eighteen fixed locations on the body that when pressed firmly cause the patient to flinch.[4] The diagnosis is now based on patient reports of a history of pain in five parts of the body, and patient reports of pain when at least 11 of 18 points cause pain when palpated by the examiner's thumb.[5] Although the Mayo Clinic states that the syndrome is neither "progressive" nor "crippling,"[6] the symptoms can be worse at some times than others.[7] Objective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia.[8]

Objective physical signs, laboratory results, and x-ray results are generally negative, and "[b]ecause the majority of patients appear tense and anxious and have

1. *Harrison's Principles of Internal Medicine* 1903 (Kurt Isselbacher, et al., eds., 9th ed. 1980).

2. *Rollins v. Massanari*, 261 F.3d 853, 855 (9th Cir.2001) (citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir.1996)).

3. Frederich Wolfe, et al., *The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia*, 33 Arthritis and Rheumatism (No. 2) 160, 170 (February 1990).

4. *Rollins*, 261 F.3d at 855.

5. *1990 Criteria* at 171.

6. Mayo Foundation for Medical Education and Research, *Fibromyalgia*, at http://www.mayoclinic.com/home? id=5.1.1.6.5 (last modified April 24, 2003).

7. Mayo Foundation for Medical Education and Research, *Fibromyalgia: Signs and Sypmtoms*, at http://www.mayoclinic.com/invoke.cfm? id=DS00079 & section=2 (last modified April 24, 2003) ("Signs and symptoms of fibromyalgia can vary, depending on weather, stress, physical activity or even just the time of day.").

8. *Id.*

no recognizable objective basis for symptoms, the syndrome is often considered psychogenic."[9] This Court, however, has recognized fibromyalgia as a physical rather than a mental disease.[10] (The disability plan in this case limits coverage for mental illness to two years, and that coverage is not claimed.) More recently, the American College of Rheumatology has issued a set of agreed-upon diagnostic criteria.[11] According to the College, "[t]he symptoms of fibromyalgia are potentially 'soft' and may be subject to examiner interpretation."[12]

Jordan complained of low back pain and leg pain to her physician, internist Nerendranath Reddy, who opined that she had fibromyalgia. Dr. Reddy referred Jordan to a neurologist, Mihoko Nelson. Dr. Nelson noted that Ms. Jordan was "in no acute distress" and "freely ambulatory" with "diffuse pain," and diagnosed fibromyalgia. Dr. Nelson then referred Jordan to a rheumatologist (the specialty area for fibromyalgia), Brian O'Connor. Dr. O'Connor noted "diffuse fibromyalgia and trigger spots of 10 out of a classic 19" (apparently referring to the 18 diagnostic points for pain on palpation recognized by the American College of Rheumatology). Dr. O'Connor stated, as his "working diagnosis," "viral-induced fibromyalgia/arthritis." Some months later, she had a "flare up of the myalgias" a week or so after "flu-like symptoms." Ms. Jordan reported that she did her own laundry, vacuuming, dusting, mopping, cooking and shopping, but not as often as she used to, and that she had discontinued her hobbies.

Travelers asked Dr. Reddy, Dr. Nelson, and Dr. O'Connor for narrative reports speaking, among other things, to her "prognosis regarding eventual return to work." None of the three physicians sent the requested reports. Despite its requests, which it repeated, MetLife did not receive any narrative report at any time from these physicians. It did not receive during its initial investigation (though it did later) any statement from any of them that Ms. Jordan's fibromyalgia made her unable to perform her work. In January of 1996, Travelers denied the disability claim on the ground that "while your activities may be limited to some degree by your symptoms of fibromyalgia, your condition is not of such severity as to preclude your ability to work at your sedentary occupation as an Administrative Sr. Secretary."

Ms. Jordan appealed, claiming that the condition was too severe to allow her to work. In April, she saw Dr. O'Connor again. This time, he noted 15 fibromyalgia trigger points, that is, points where, when he palpated with his thumb, she reported pain. In August, Travelers again wrote Dr. O'Connor as well as Dr. Reddy. The letters asked them to state, based on the diagnosis of fibromyalgia, "what prevented your patient from performing her occupation," and "what objective findings prevented her from performing sedentary work." This time Dr. Reddy, her internist, responded, writing that "patient can't function even sedentary work at present because of flare up of her fibromyalgia and intensity of pains." Her rheumatologist, Dr. O'Connor, again did not respond.

Travelers sent Ms. Jordan's file materials for an evaluation by an internist, J.W.

---

9. 1 *Cecil Textbook of Medicine* 208 (Paul Besson, et al., eds., 15th ed. 1979).

10. *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 796, 799 (9th Cir.1997).

11. *1990 Criteria* at 171.

12. *Id.* at 170.

Rodgers, and by a rheumatologist, Jeffrey D. Lieberman. Dr. Rodgers wrote that "there is little objective evidence for a disabling medical dx [diagnosis] and I wonder about a nervous/mental dx such as depression/ anxiety" (Dr. O'Connor had prescribed Zoloft, an antidepressant). Regarding work, Dr. Rodgers wrote that "there is little evidence that the patient is physically incapacitated from gainful employment and that she could not do the customary activities" or the work in her job description. Dr. Lieberman, MetLife's rheumatologist, faulted the diagnostic impressions of Dr. O'Connor, Ms. Jordan's treating rheumatologist, on several grounds. These included treatment inconsistent with the standard treatment for fibromyalgia, Dr. O'Connor's error in how many trigger points were in the American College of Rheumatology standard diagnostic criteria, and that the virus he identified as the source of Ms. Jordan's "flare-up" should have resolved "within several weeks or months at the most." Dr. Lieberman's conclusion was that "the severity of this patient's fibromyalgia is moderate," and she "should be capable of sedentary work" based on her job description.

Travelers sent Dr. O'Connor copies of the reports it had obtained from Dr. Rodgers and Dr. Lieberman. Dr. O'Connor responded with a terse letter, stating that "under her current state of affairs, she is medically disabled from her job as a secretary," but not explaining why. MetLife rejected Ms. Jordan's appeal on the ground that her fibromyalgia was not so severe as to disable her from working at her job.

Ms. Jordan appealed again in October of 1996 but did not submit any new evidence that would support her claim of disability. After this second review, done by a different claims reviewer, the administrator issued a final denial of Ms. Jordan's claim.

Ms. Jordan filed suit. The district court denied Jordan's motion for summary judgment and granted MetLife's,[13] after a careful analysis of the medical evidence relied upon by Travelers and MetLife. Jordan appeals.

## Analysis

Our en banc decision in *Kearney v. Standard Insurance Co.* establishes the procedure for review of an ERISA determination.[14] We review summary judgment de novo.[15] The district court and we, on our de novo review of district court summary judgment determinations, must decide whether to review the plan administrator's denial of the claim de novo or for abuse of discretion. *Kearney* holds that, when a denial of benefits is challenged in a district court under 29 U.S.C. § 1132(a)(1)(B), review of the administrator's decision is de novo, unless the plan unambiguously confers discretion on the administrator.[16] *Kearney* applies the Supreme Court holding in *Firestone Tire and Rubber Co. v. Bruch* that the "denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[17] The Supreme Court, in *Firestone,*

13. *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 63 F.Supp.2d 1145, 1164 (C.D.Cal.1999).

14. *Kearney v. Standard Insurance Co.,* 175 F.3d 1084 (9th Cir.1999).

15. *Boise Cascade Corp. v. United States,* 329 F.3d 751, 754 (9th Cir.2003).

16. *Kearney,* 175 F.3d at 1089.

17. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

adopted for purposes of ERISA review the Restatement of Trusts principle that "[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion."[18]

■ When we review for abuse of discretion, it is because the plan has put the locus for decision in the plan administrator, not in the courts, so we cannot substitute our judgment for the administrator's. We can set aside the administrator's discretionary determination only when it is arbitrary and capricious. We have held that a decision "grounded on *any* reasonable basis" is not arbitrary or capricious,[19] and that in order to be subject to reversal, an administrator's factual findings that a claimant is not totally disabled must be "clearly erroneous."[20]

Thus, we examine, first, whether the administrator is entitled to deferential review, and second, whether the administrator nevertheless arbitrarily denied benefits to Jordan.

I. Standard of Review

The plan in this case contains the sentence, "[t]he Travelers has the discretion to construe and interpret the terms of the Plan and the authority and responsibility to make factual determinations. . . ." That language unambiguously confers discretion on the administrator. We therefore review the administrator's decision only for abuse of discretion, not de novo.

■ Jordan argues that the actions of Travelers and MetLife were tainted by conflict of interest so that they should be reviewed non-deferentially despite the unambiguous conferral of discretion. This argument was also made in *Kearney*, but we did not reach it because we reviewed de novo for the different reason that the plan in that case did not unambiguously confer discretion.[21] Shortly after *Kearney*, however, we reiterated our pre-*Firestone* rule that the abuse of discretion standard can be heightened only by a "serious" conflict of interest.[22] "Of course, if the benefit plan gives discretion to an administrator . . . who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."[23] But the standard of review changes with the existence of a "serious" conflict only.

■ "Conflict of interest," for purposes of determining whether de novo review is appropriate despite an unambiguous conferral of discretion, does not mean that the plan has an interest that conflicts in the ordinary sense of the word with the interest of the claimant. Although an apparent conflict exists where, as here, the insurance policy is both issued and administered by the same party, in order to establish a "serious" conflict of interest—and thus to substitute a heightened standard of review for abuse of discretion review in ERISA cases—"the beneficiary has the burden to come forward with material,

---

18. *Id.* at 111, 109 S.Ct. 948 (quoting Restatement (Second) of Trusts § 187, Cmt. d (1959)).

19. *Horan v. Kaiser Steel Retirement Plan,* 947 F.2d 1412, 1417 (9th Cir.1991) (emphasis in the original) (citation omitted).

20. *Jones v. Laborers Health & Welfare Trust Fund,* 906 F.2d 480, 482 (9th Cir.1990).

21. *Kearney,* 175 F.3d at 1090 n. 2.

22. *Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 943 (9th Cir.1999).

23. *Firestone,* 489 U.S. at 115, 109 S.Ct. 948 (internal citations and quotations omitted).

probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary."[24] Though the claimant obviously has a financial interest in getting the money, while the plan has a financial interest in keeping it, that alone cannot establish conflict of interest in the administrator, because it would leave no cases in the class receiving deferential review under *Firestone.*

Jordan argues that a serious conflict of interest in this case results from three claimed failings of the plan administrator. She also argues that these conflicts of interest demonstrate an abuse of discretion by the administrator. We discuss each in turn.

■ Jordan's first argument is that the insurers failed to obtain a number of leave slips Dr. Reddy signed. Jordan submitted the leave slips to the district court. They are slips Dr. Reddy wrote that allowed Ms. Jordan to have her absence from work classified as excused. The first one says "Vickie Jordan is under my medical care since 05–17–95 and should stay off of work until June 17, 1995. If you have any questions you can call my office." The rest are similar, each giving her another month's excuse. A couple of them mention low back pain or fibromyalgia as the reason, while the rest just state, "due to her medical condition."

Failure of the insurers to obtain the leave slips does not establish a breach of fiduciary duty that would cost them their discretionary authority or constitute an abuse of discretion. First, they did not matter. MetLife obtained Dr. Reddy's

statement that Jordan was disabled by fibromyalgia before rendering its final determination. The leave slips did not say any more than that (and all but two said less). Jordan argues that MetLife should have asked for these leave slips pursuant to its duty to describe "material or information necessary for the claimant to perfect the claim,"[25] but these redundant *ipse dixits* were unnecessary. They would have added nothing. Second, there is no reason shown that Jordan could not have produced the leave slips. They were given to her by Dr. Reddy, she knew of their existence while MetLife did not, and there was nothing esoteric about them that might impair her understanding of what they were or why they might bear on her disability claim. Third, MetLife *did* ask Jordan for material such as the leave slips. When Jordan filed her first appeal, MetLife sent her a written request for any medical documentation that "supports a condition of total disability" including "your restrictions and limitations." MetLife could not know to ask for the leave slips because Jordan, but not MetLife, knew that they existed, and Jordan should have produced them when MetLife asked her for documentation supporting her claim. Where (1) the administrator asks for documents that the claimant possesses or to which the claimant has equal or superior access, (2) the claimant does not produce the documents, and (3) the documents would not have altered the administrator's decision, no conflict of interest can be established based on the administrator's failure to obtain the documents.

■ Second, Jordan argues that MetLife was acting under a conflict of interest

**24.** *Bendixen,* 185 F.3d at 943 (citing *Atwood v. Newmont Gold Co.,* 45 F.3d 1317, 1323 (9th Cir.1995)) (internal quotations omitted).

**25.** Administration and Enforcement under the Employee Retirement Income Security Act of 1974, 29 CFR 2560.503–1(f); *see also Booton v. Lockheed Medical Benefit Plan,* 110 F.3d 1461, 1463 (9th Cir.1997).

because it arbitrarily demanded"objective" proof of a condition that cannot be objectively established. The contention is unsupported by the record. MetLife denied her claim, not because it asserted that she did not suffer from fibromyalgia, but because it asserted that she had not established that her fibromyalgia disabled her from working.

Fibromyalgia is a medical label that, as Jordan correctly argues, cannot be objectively proved. The American College of Rheumatology deems the diagnosis appropriate for an otherwise unexplained condition in which a patient complains of pain on the left side of the body, the right side of the body, above the waist, below the waist, and in the axial skeleton, and in at least 11 of 18 specified points when the examining physician palpates them with his thumb.[26] The symptoms of fibromyalgia consist of the patient's reports of pain and nothing else. Objective tests, such as myelograms, rather than proving the existence of fibromyalgia, are used to rule out alternative explanations for the pain, leaving fibromyalgia as the remaining label for the collection of symptoms. Thus if the administrator had said, "we will not accept fibromyalgia as a diagnosis unless you present objective evidence of it such as positive findings on x-rays," she would have been demanding what cannot exist, which is what Jordan claims she did.

The administrator acknowledged that Jordan had been diagnosed as having fibromyalgia and did not dispute that Jordan had the condition, or demand objective evidence that she had it. Rather, the administrator asked for evidence that the fibromyalgia she suffered from disabled her from working at her job. MetLife's letter to her doctors acknowledged their diagnosis of fibromyalgia, and asked "based on her diagnosis ... *what prevent-*

*ed your patient from performing her occupation*" and also asked "what objective findings *prevented her from performing sedentary work.*" If Jordan's physicians believed that the effects of her fibromyalgia disabled her from performing her occupation, those medical experts could have responded to the administrator's request for further information with at least *some* answer explaining why the illness prevented Jordan from performing her work as a secretary. However, Drs. Reddy and O'Connor merely reiterated their conclusory findings of disability. They did not answer the quite reasonable inquiry of the administrator. MetLife wrote in its final denial "[t]he record on hand shows you have been diagnosed with fibromyalgia, anxiety and depression. The documentation does not support *an ongoing disability* due to a mental/nervous condition or diagnosis." That is not a judgment that she did not have fibromyalgia. It is a judgment that, although she had been diagnosed as having fibromyalgia, the record the administrator had did not show that she was unable to work because of it.

Third, Jordan argues that Metlife ignored her physicians' reports, and by doing so, MetLife breached its fiduciary duty and abandoned its right to deferential review. But MetLife did not *ignore* her physicians' statements that she was disabled; it considered and *rejected* them, after careful consideration. Travelers and MetLife repeatedly asked Ms. Jordan's doctors to explain *why* they thought she was disabled. They failed to respond. They gave the administrator nothing but their *ipse dixit* to substantiate the claim. MetLife had Jordan's physicians' records and opinions reviewed by Dr. Rodgers, an internist like Dr. Reddy, and Dr. Lieberman, a rheumatologist like Dr. O'Connor,

26. *1990 Criteria* at 171.

and both disagreed with her doctors. MetLife gave Jordan's physicians Dr. Rodgers's and Dr. Lieberman's reports so that her physicians could explain why they disagreed. Again, they failed to respond. Under our recent decision after remand in *Black & Decker Disability v. Nord,* we held that the failure of an employee's physician to respond to inquiries by the plan administrator undermined evidence in the petitioner's favor.[27] Just such a failure occurred here. Thus we are bound to treat Jordan's treating physicians' opinions that she was disabled by her fibromyalgia as "undermined," which is to say less reliable or unreliable.

Somebody has to make a judgment as to whether a medical condition prevents a person from doing her work, and the governing instrument assigns the discretion to the claims administrator. With a condition such as fibromyalgia, where the applicant's physicians depend entirely on the patient's pain reports for their diagnoses, their *ipse dixit* cannot be unchallengeable. That would shift the discretion from the administrator, as the plan requires, to the physicians chosen by the applicant, who depend for their diagnoses on the applicant's reports to them of pain. That the administrator ultimately rejects the applicant's physicians' views does not establish that it "ignored" them.

Because Jordan has failed to demonstrate that the conflicting interest caused a breach of the administrator's fiduciary duty to the beneficiary, we review her denial of disability benefits for abuse of discretion.

## II. Review of Record

Our circuit's approach to review of ERISA cases was changed by the recent Supreme Court decision in *Black & Decker Disability Plan v. Nord.*[28] We had taken the position that an ERISA plan administrator must either accept the opinion of a claimant's treating physician, or, if the administrator rejects that opinion, "come forward with specific reasons for that decision, based on substantial evidence in the record."[29] We imported this standard from the one the Social Security Administration must use under its own regulations for Social Security disability cases.[30] As a practical matter, the standard gives especially great weight to the opinion of a claimant's treating physician.

■■ In the panel decision in *Nord,* we had "roundly"[31] reversed a summary judgment that failed to give this preference to a treating physician's opinion, and the Supreme Court roundly reversed us, holding that "courts have no warrant to order application of a treating physician rule to employee benefit claims made under ERISA."[32] Rejecting all of our reasons for the rule, the Court held, "Nothing in the Act ... suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they

---

27. *Nord v. Black & Decker Disability,* 356 F.3d 1008 (9th Cir.2004) (order vacating opinion on remand from the Supreme Court and reinstating district court's opinion upholding denial of benefits).

28. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

29. *Regula v. Delta Family–Care Disability Survivorship Plan%,* 266 F.3d 1130, 1139 (9th Cir.2001), *vacated by* 539 U.S. 901, 123 S.Ct. 2267, 156 L.Ed.2d 109 (2003) (mem.).

30. *Id.*

31. *Nord,* 123 S.Ct. at 1968.

32. *Id.* at 1969.

reject a treating physician's opinion."[33] Nor was there as much room for judicial innovation in the absence of regulation by the Secretary of Labor, because the statute engaged an administrative agency to interpret the Act.[34]

The Court emphasized the inappropriateness of importing Social Security rules into the ERISA context. "In contrast to the obligatory nationwide social security program, nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kinds of plans employers must provide."[35] Employers have a "large leeway" to design plans, so unlike a Social Security claim, the validity of a claim is "likely to turn in large part on interpretation of terms in the plan at issue" rather than on a uniform set of criteria.[36]

The penultimate paragraph of *Nord* is as follows:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.[37]

[10] This paragraph quite plainly holds that a treating physician's opinion gets no special weight and can be rejected on the basis of reliable evidence with no discrete burden of explanation. *Nord* does not set out any new framework for reviewing administrator's denials. Rather, it rejects our court's treating physician rule and otherwise leaves ERISA review alone, thus prohibiting us from overturning discretionary decisions by administrators because they failed to defer to treating physicians' opinions.

 Consistently with the statute, *Firestone,* and *Nord,* we turn to the deferential review of the record that we must perform, as set out by our law before we erroneously grafted the treating physician rule onto it. The statute requires the plan administrator to set forth the specific reasons for denial of a claim, written in a manner calculated to be understood by the participant, and must "afford a reasonable opportunity ... for a full and fair review" by the administrator of adverse decisions.[38] Principles of trust law are imported into ERISA, and "[t]rust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers."[39]

 Deferential review, of course, does not mean no review. If the administrator's decision is arbitrary, as where the administrator "arbitrarily refuse[s] to credit a claimant's reliable evidence," the administrator's decision fails the "fair review" requirement of the statute.[40] But as long as the record demonstrates that there is a reasonable basis for concluding that the medical condition was not disabling, the decision cannot be characterized as arbitrary, and we must defer to the decision of the plan administrator.[41]

33. *Id.* at 1970.

34. *Id.*

35. *Id.* at 1971.

36. *Id.*

37. *Id.* at 1972.

38. 29 U.S.C. § 1133(1), (2).

39. *Firestone,* 489 U.S. at 111, 109 S.Ct. 948.

40. *Nord,* 123 S.Ct. at 1972.

41. See *Horan,* 947 F.2d at 1417.

■ The administrator here had conflicting reports from Jordan's treating physicians and MetLife's reviewing physicians. This is typical of the evidence used in disability determinations. Reasonable people can disagree on whether Jordan was "disabled" for purposes of the ERISA plan. Because that is so, the administrator cannot be characterized as acting arbitrarily in taking the view that she was not. The administrator had before her conclusory statements from Jordan's doctors that she was disabled, and the relatively more thorough and careful opinions from the plan's doctors that, although she apparently suffered from the disease, she was not entirely disabled from working by it.

That a person has a true medical diagnosis does not by itself establish disability. Medical treatises list medical conditions from amblyopia to zoolognia that do not necessarily prevent people from working. After a certain age, most people have pain, with or without palpation, in various parts of their body, and they often have other medical conditions. Sometimes their medical conditions are so severe that they cannot work; sometimes people are able to work despite their conditions; and sometimes people work to distract themselves from their conditions. Physicians have various criteria, some objective, some not, for evaluating how severe pain is and whether it is so severe as to be disabling. It is not for an appellate court to decide that fibromyalgia should be treated by ERISA plan administrators as disabling in a particular case. That is a medical and administrative judgment committed to the discretion of the plan administrator based on a fair review of the evidence.

Without taking upon ourselves the judgment of Jordan's disability, we must nonetheless look to the record to determine whether there is a reasonable basis for the administrator's conclusion that Jordan was not disabled by her fibromyalgia. We find that there is. Jordan's chart had a number of objective and subjective indications that her pain was not so severe as to prevent her from doing her work, such as her physician's observations that she was "in no acute distress," was "freely ambulatory," and had "no proximal muscle weakness" (weakness might indicate atrophy from pain-induced disuse). She reported activities, such as laundry, vacuuming, dusting, mopping, washing dishes, cooking, and shopping for groceries, that cut against a determination of severe pain, though a tough individual might perform such activities despite considerable pain.

In this case, Jordan's physicians failed to respond to Travelers' and MetLife's repeated reasonable requests for details, such as the doctors' treatment history with her, her prognosis, and an explanation of how her condition affected her current ability to work and her rehabilitation potential. All the physicians gave MetLife in response were terse statements such as Dr. O'Connor's "under her current state of affairs, she is medically disabled from her job as a secretary." This left unanswered such critical questions as what examinations he had done, why he reached that conclusion, and how long he expected the "current state of affairs" to last. The term "flare up" implied a short term situation. Though the report by one of MetLife's physicians, Dr. Rodgers, was equally terse, the other report, by Dr. Lieberman, provided serious reasons for his conclusions, and allowed for a reasonable independent judgment by MetLife in reliance on it.

Jordan argues that her case is similar to *Zavora v. Paul Revere Life Insurance*

*Co.*[42] In that case, we rejected an argument that the administrator's decision should be reviewed de novo,. and then we reviewed for abuse of discretion.[43] Zavora's ophthalmologist wrote the administrator that Zavora could not work on account of disabling pain, because a thorn had become buried in the back of his eye.[44] The administrator referred the claim to "medical personnel" who were not ophthalmologists and rejected the claim on the ground that Zavora's problem was "dry eye," which had not disabled him before and should not disable him now, without conferring with Zavora's ophthalmologist about this notion.[45] We concluded that the administrator had abused its discretion in denying the claim.[46]

There are at least three critical distinctions between *Zavora* and this case. First, in the case at bar, the administrator referred the claim to a physician in the relative specialty area, a rheumatologist. Second, MetLife sent its medical experts' reports to Jordan's doctors so that they could explain why they disagreed (and they failed to respond). Third, it is arbitrary and capricious to suppose, in the absence of any medical opinion in support of the supposition, that a thorn buried in the back of the .eye causes no pain or disability beyond what "dry eye" does, where an examining ophthalmologist has said the opposite. By contrast, there is nothing arbitrary or capricious in finding inadequate, with the support of qualified physicians, a claim of disability supported only by a diagnosis of fibromyalgia with no explanation of why it should amount to a disabling condition.

Jordan also argues that MetLife acted arbitrarily because it never gave her adequate notice of what evidence she needed to produce to establish her claim. A plan administrator must furnish a person whose claim has been denied with"a description of any material or information necessary for the claimant to perfect the claim and an explanation of why· such material or information is necessary."[47] But the only evidence Jordan says she could have produced, and did not, are her monthly leave slips. As explained above, .these would have made no difference.

Jordan cites· *Booton v. Lockheed Medical Benefit Plan,*[48] but the case illumines more by contrast than similarity. Booton was kicked in the teeth by a horse, so her dental surgeon had to build a bridge to the back teeth to reset her front teeth, and had to prepare her back teeth so that they would hold the bridge.[49] The administrator turned down her claim for the work on the back teeth without ever asking why it had to be· done, on the ground that the horse did not kick her in the back teeth.[50] Instead of asking her dentists what the horse had to do with the work on the back teeth, the administrator "sent out a stream of cookie-cutter denial letters."[51] The record showed that Booton's dentists "were ready and able to explain their work but no one at Aetna sought their explanations." We held that the denial of the

42. *Zavora v. Paul Revere Life Insurance Co.,* 145 F.3d 1118 (9th Cir.1998).

43. *Id.* at 1122.

44. *Id.*

45. *Id.* at 1123.

46. *Id.* at 1122–23.

47. 29 C.F.R. § 2560.503–1(f).

48. *Booton v. Lockheed Medical Benefit Plan,* 110 F.3d 1461 (9th Cir.1997).

49. *Id.* at 1464.

50. *Id.* at 1462.

51. *Id.* at 1462.

claim without explanation and without obtaining evidence of the claimant's rational explanation was an abuse of discretion.[52] By contrast, in this case, the record does *not* show that Jordan's physicians were "ready and able to explain" their views, and they were repeatedly asked for their explanations but failed to respond. This does not establish an abuse of discretion by MetLife.

## Conclusion

Jordan's evidence that she was disabled was slight, and its reliability was questionable. Notably, Ms. Jordan's physicians failed to respond to requests for explanations of why her fybromyalgia disabled her from working. Jordan asks us to accept a more conclusory remark to that effect from a treating physician, but accepting a conclusory remark without any explanation is much more easily characterized as arbitrary than what the administrator did.

The judgment of the district court is AFFIRMED.