Judy R. WUOLLET, Plaintiff,

v.

The SHORT–TERM DISABILITY PLAN OF RSKCO; The Long–Term Disability Plan of RSKCo; and Continental Casualty Company, Defendants.

No. Civ.04–652 RHK/JGL.

United States District Court, D. Minnesota.

March 3, 2005.

Denise Y. Tataryn, Mansfield, Tanick & Cohen, PA, Minneapolis, MN, for Plaintiff.

Doreen A. Mohs, Rider Bennett, LLP, Minneapolis, MN, for Defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

After Continental Casualty Company ("Continental") denied Judy Wuollet's claim for post polio syndrome-related short-term and long-term disability benefits, Wuollet filed suit alleging that Continental, the Short–Term Disability Plan of RSKCo, and the Long–Term Disability Plan of RSKCo (collectively, "Defendants") breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"). Each side has moved for summary judgment. For the reasons set forth below, the Court will grant Wuollet's Motion and deny Defendants' Motion.

### Background

#### I. Wuollet's Disability Plans

Wuollet was a Nurse Care Manager at RSKCo, a workers' compensation claim management company. During her tenure, she participated in RSKCo's short-term and long-term disability plans.[1] Under both plans, "disability"

---

1. The record reveals three disability "plans"—the Integrated Disability Program, the Short Term Disability Plan, and the Long Term Disability Policy. Wuollet contends that the Integrated Disability Program, which contains short-term and long-term disability plans, superseded the Short Term Disability

means that Injury or Illness causes physical or mental impairment to such a degree of severity that the employee is:

1. Continuously unable to perform the Material and Substantial Duties of the employee's Regular Occupation; and,

2. Not working for wages in any occupation for which the employee is or becomes qualified by education, training or experience.

"Material and Substantial Duties" are "the necessary functions of the employee's Regular Occupation that cannot be reasonably omitted or altered." "Regular Occupation" is "the occupation that the employee is performing for income or wages on the employee's Date of Disability. It is not limited to the specific position the employee held with RSKCo." Benefit claims under the plans were reviewed and administered by Continental. (Mohs Aff. Ex. A at AR 84, 429, 483, 491, 1169, 1177, 1192, 1196, 1278, 1282.)

## II. Wuollet's Medical History Prior To Her Short–Term Disability Claim

In 1952, at the age of three, Wuollet was diagnosed with polio and since then she has had several surgeries on her lower extremities, including heel lengthening, hammertoe corrections, and the fusion of her ankle joints. (See Mohs Aff. Ex. A at AR 80–81, 502.) Beginning in the late 1980s and early 1990s, Wuollet experienced weakness and fatigue. In 1993, Dr. Kurtis Hoppe diagnosed her with Post Polio Syndrome ("PPS"). (Id. at AR 581.) PPS is a slowly progressing syndrome that affects twenty-five percent or more of polio survivors and may strike up to forty years after the initial polio infection. Common symptoms include fatigue, weakness, and pain. PPS patients may also suffer a host of other symptoms, including muscle cramps and twitches. (See id. at AR 1056, 1094–1105, 1113–21); see also Abram v. Cargill, Inc., 395 F.3d 882, 884 n. 2 (8th Cir.2005) (describing PPS).

On November 5, 1996, Wuollet saw Dr. Barbra Seizert, a physician who practices in physical medicine and rehabilitation. (Mohs Aff. Ex. A at AR 79–83; see id. at AR 1147–49 (curriculum vitae).) Dr. Seizert noted that Wuollet complained of spasms in her back and legs and had pain in her right knee. (Id. at AR 79.)

In 2001 and 2002, Wuollet saw Dr. Anne Brutlag, a specialist in rehabilitative medicine. (See id. at AR 1150–52 (curriculum vitae)); Abram, 395 F.3d at 883–84. On September 5, 2001, Dr. Brutlag confirmed Wuollet's PPS and stated:

> She does note discomfort in her low back and right hip region mainly in association with static standing or moving to standing from a seated position.... She does continue to make considerable lifestyle changes. She is gradually experiencing more and more fatigue which she relates to her [PPS]. She does continue to work full-time, and notes that she is at this point able to tolerate it, but has to make a lot of adjustments in other parts of her life.

Plan and the Long Term Disability Policy. Defendants respond that the Integrated Disability Program did not supersede the other plans. Each plan defines "disability" identically in all material respects (although one is disabled under the long term plan only if continuously unable to engage in "any occupation" for which one is qualified). (Compare Mohs Aff. Ex. A at AR 1209–11 (Integrated Disability Program); with AR 1179–80 (Short Term Disability Plan); and with AR 1273, 1281–82 (Long Term Disability Policy).) However, according to Wuollet, they differ on whether they provide the plan (or claim) administrator discretion to review disability claims. The Court need not decide which "plan" controls; assuming that the operative plan—whichever it is—gives the administrator discretion, the Court finds that the administrator abused its discretion in denying Wuollet's disability claims. See infra Analysis.

(Mohs Aff. Ex. A at AR 797–98.) Dr. Brutlag also noted that Wuollet was "actually doing quite well" and "[h]er back pain is definitely better." (*Id.* at AR 798.) She recommended exercise and using Celebrex, an anti-inflammatory medicine. (*Id.*)

On February 12, 2002, Dr. Brutlag reported:

Judy Wuollet is seen in recheck examination today reporting that her pain has increased and she is having more and more difficulty walking. She notes that she has been having pain and spasm in her back more consistently, and is having more pain laterally and posteriorly at the right greater than left hip and buttock. She notes that it is gradually becoming more and more difficult for her to walk distances, and she has to lean more and more heavily on her cane.... She currently notes fair ability to perform light housework, sleep, her regular and light duty job; inability to perform heavy housework, yardwork, sports and recreational activities. She notes increased pain in the back in association with bending, lifting, jarring, static sitting, static standing, and distance walking. Stress and tension also increase her symptoms.... She continues to work full-time as a nurse case manager for a worker's compensation group. She notes that she is very fatigued by the end of the day, and notes considerable increase in her pain level and fatigue by the end of a work week....

She is very much struggling with the pain and fatigue, and is concerned about her ability to continue to work on a full-time basis certainly, and perhaps even part-time.

(*Id.* at AR 809–11.)

On March 5, 2002, Wuollet again saw Dr. Brutlag, who observed:

She notes that her sleep has gradually become more disturbed and she is having more difficulty performing light housework. She reports fair ability to perform light duty work, poor ability to sleep, perform light housework and her regular job, inability to perform heavy housework, yardwork, and sports and recreational activities.... She is having more difficulty coping with her pain. She notes increased symptoms in association with sitting, particularly driving in a car, walking more than a block and a half, and static standing.

(*Id.* at AR 818–19.) Dr. Brutlag recommended facet injections for Wuollet's back pain and continued medication. (*Id.* at AR 819.)

On June 5–11, 2002, Wuollet took paid leave from work due to back and neck pain. (*See id.* at AR 13, 546–47.) From this point on, she never returned to work.

On June 11, 2002, Dr. Brutlag determined that Wuollet was unable to continue with her employment. Dr. Brutlag observed:

She reports that her symptoms have escalated since I last saw her in March. She is having pain in her neck and shoulder on the right side and in her right buttocks and posterolateral thigh. She has occasional pain and numbness into her right arm and hand, notes that she is gradually becoming more and more fatigued, and less and less able to continue with her job and outside activities. Her activity tolerance has significantly decreased.... She current[ly] reports fair ability to sleep, poor ability to perform light housework, sports and recreational activities; inability to perform heavy housework, yardwork, and her regular job.... Pain increases in association with bending, lifting, twisting, jarring, tension, stress, static sitting, static standing, and distance walking. She has somewhat different job description at present and is moving and

carrying or lifting a lot of different files. She has been taking frequent vacations and a couple of sick days each month. She notes a marked increase in pain and fatigue as the week progresses. She is completely exhausted by the time she gets home, and is sometimes unable to get into work due to pain and fatigue. (*Id.* at AR 820.) Based upon her observations, Dr. Brutlag concluded:

Judy is I think at this point disabled due to her [PPS] with progressive weakness and her osteoarthritis. She is in the process of completing paper work regarding this disability, and a note was provided for her for the next six months. She has been struggling for years with her progressive fatigue, pain, and weakness, and I think has hit the point where she is unable to continue with productive employment at this point.

(*Id.* at AR 821.)

### III. Wuollet's Short–Term Disability Claim and Subsequent Medical History

On the same day that Dr. Brutlag concluded that Wuollet was disabled, June 11, 2002, Wuollet submitted a claim to Continental for short-term disability benefits. (Mohs Aff. Ex. A at AR 1, 13, 84.) She reported her medical condition as PPS and osteoarthritis and her symptoms as progressive weakness, tiredness, muscle spasms, joint pains, difficulty sleeping, and fatigue. (*Id.* at AR 13.) She stated that her essential job duties involved "sitting 80–90%, computer 80–90%, phones, ... Life Care planning, handl[ing] numerous & heavy files, increased keyboarding." (*Id.* at AR 14.) Dr. Brutlag provided a note stating that Wuollet was "totally & completely disabled due to [PPS], progressive weakness & osteoarthritis" through December 31, 2002. (*Id.* at AR 22.) Wuol-

let's claim was assigned to a Continental nurse care manager, Krista Benitez, and Continental approved Wuollet's claim, but only through August 16, 2002. (*Id.* at AR 27.)

On July 1, 2002, Continental received a fax from Wuollet's manager, Gail Russell, with an attached Physical Demands Analysis and description of Wuollet's job. (*Id.* at AR 39–42.) On the fax cover sheet, Russell wrote:

Attached is the job description and physical demands analysis (completed to the best of my ability). Judy [Wuollet] has been doing full time care planning which requires no travel to visit clients or doctors. She reviews medical records which at times can be voluminous. She does telephone and computer work and needs to be able to type. She can change positions as needed. If she is allowed to come back to the office other employees can assist with getting documents from the printer and can move/carry any medical records to her desk. If you want to discuss this further or if the doctor needs to speak with me about what can be accommodated, I would be happy to speak with him/her. Her job can also be accommodated in her home environment if that is acceptable to her physician as well. Thank you.

(*Id.* at AR 39.) [2]

In the Physical Demands Analysis, Russell stated that Wuollet's job required no travel and was self-paced. (*Id.* at AR 40.) She also noted that "office staff can assist with [lifting medical records] if necessary" and that RSKCo "can accommodate home environment." (*Id.* at AR 40, 41.)

The job description attached to the Physical Demands Analysis described

---

**2.** There is no evidence of any further discussions between Continental and Russell or of any discussions between Russell and Wuollet's physicians.

Wuollet's job as providing medical case management for moderately complex injuries and claims. (*Id.* at AR 42.) It listed her responsibilities as including "[t]ravel[ing] to visit clients, physicians and medical facilities as needed or required." (*Id.*) It also noted that her job required the "[a]bility to produce a high volume of quality work in a fast-paced environment." (*Id.*)

On July 10, 2002, Dr. Brutlag told Continental that Wuollet suffered from PPS, chronic low back pain, and progressive weakness, fatigue, and muscle atrophy. (*Id.* at AR 3.) Dr. Brutlag noted that "for many years [Wuollet] has become progressively worse" and that she was unable to do her job, as repetitive arm use, walking, and standing were problematic. (*See id.*) She also noted that she did not believe that Wuollet could perform her job from home. (*Id.*)

On July 23, 2002, Wuollet again saw Dr. Brutlag. Dr. Brutlag noted that Wuollet reported feeling slightly better since being off from work, although she fatigued easily and had substantial limitations in her ability to sit, stand, or walk for extended periods of time. (*Id.* at AR 53.) Wuollet reported fair ability to sleep and perform light housework, but an inability to perform heavy housework, yardwork, sports and recreational activities, or her regular job. (*Id.*) Her pain increased in association with static standing, distance walking, lifting, and carrying anything over ten pounds. (*Id.*)

On September 5, 2002, Continental sent a nurse, Pam Tegelhutter, to visit Wuollet in her home and conduct a "functional assessment." (*Id.* at AR 67–69.) Tegelhutter was provided with the following instructions:

Is claimant able to perform a seated position with restrictions and limitations to working with computers and phones, in a seated position, limited standing, no pushing, pulling, and minimal lifting and bending, and able to adjust and switch position?

Claimant has also been offered to work out of home, would she be able to do this with restrictions as stated? If claimant can not will she be able to after a later date?

The above questions are to address her ADL's, her function in home, please observe her hands, upper body strength, is her home where she would be able to function in a capacity of working out of.

(*Id.* at AR 66.)

After a one-hour visit, Tegelhutter prepared a report in which she noted that Wuollet was able to rise from a seated position and that she seemed relatively comfortable, although she grimaced, rubbed the back of her neck, and stretched her neck muscles. (*Id.* at AR 69–70.) Although Tegelhutter did not notice Wuollet having tremors, she noted that Wuollet expressed that she had a "great deal of pain in her upper back and neck recently" and that "fatigue is her worst enemy." (*Id.* at 70.) Tegelhutter also noted that Wuollet was able to prepare meals and cook, perform some very light housework, sing in a choir, work on her computer for 20–30 minutes at a time, and dress and bathe herself. (*See id.* at AR 70–71.) Finally, Tegelhutter discussed the possibility of Wuollet "doing some type of work" from home. (*Id.* at 71.) Wuollet responded that stress exacerbates her leg weakness and pain and that her home was not set up for work and it lacked space.[3] (*Id.*)

---

3. On the same day as Nurse Tegelhutter's visit, September 5, 2002, Wuollet was selected for termination as part of a reduction in force. (Mohs Aff. Ex. A at AR 842.)

## IV. Short–Term Disability Claim Denied

On September 26, 2002, three weeks after Tegelhutter's one-hour visit, Continental denied Wuollet's short-term disability claim:

[G]iven the condition of [PPS] and allowing testing, conservative treatment, medications and facet joint injections, with your functional level of activity and the information presented, does not support a functional impairment that would prevent you from performing the Material and Substantial duties of your occupation in a full-time capacity. . . .

(Mohs Aff. Ex. A at AR 85.) Continental described Wuollet's job as "work[ing] with computers and phone, with typing and filing, minimal standing, walking, pushing, pulling, lifting or carrying with no travel," and stated that "[a]ccommodations have been offered from your employer for you to work out of your home versus office." (*Id.* at AR 84.)

## V. Wuollet Appeals and Submits Additional Medical Information

On November 7, 2002, Wuollet appealed Continental's decision. (Mohs Aff. Ex. A at AR 95.) On December 5, 2002, she sent Continental a 59–page medical and work history summary. (*Id.* at AR 140–204.) In these documents, Wuollet stated that her job included moving client files weighing as much as ten pounds, traveling to interviews and meetings, and billing 150 hours per month "without clerical or support staff." (*See id.* at AR 141.)

She also noted that Gail Russell's description of her job was inaccurate. (*Id.* at 190.) For example, she disputed Russell's characterization of her job as "very sedentary . . . no travel required," noting that she had to travel. (*Id.*) She referred to her own job description and cited a February 26, 2002, 170–mile trip she had made for work. (*Id.* at AR 173, 190.) She also disputed Russell's characterization that

"office staff can assist with this task [lifting files] if necessary," stating that she was required to lift the files herself. (*Id.* at AR 190.)

Wuollet also submitted Dr. Brutlag's note from a September 10, 2002 visit. On that visit, Dr. Brutlag noted that Wuollet experienced pain associated with static sitting, static standing, and distance walking, as well as increased pain in her neck, shoulder, right arm, and lower back. (*See id.* at AR 211.) Dr. Brutlag observed that Wuollet's fatigue and muscle aches are related to her PPS, but that she was doing "very well" with pacing herself and adjusting her activity level. (*Id.* at AR 212–13.)

Continental submitted Wuollet's claim to Dr. Dan Gerstenblitt, who is board-certified in internal medicine and occupational medicine. (*Id.* at AR 241.) Continental instructed Dr. Gerstenblitt to

review the information submitted and advise if the evidence supports an impairment that would prevent the claimant from performing her job which involves use of a computer and telephone, and reviewing medical files in an ergonomically correct work station (she also has the ability to work from home). Please explain your answer.

(*Id.* at AR 238.)

On January 27, 2003, Dr. Gerstenblitt submitted his first report. Upon his review of the information provided, he "failed to see any reason why [Wuollet] suddenly stopped working on [June 5, 2002]." (*Id.* at AR 240.) He noted that "[w]hile [she] is documented to have lower extremity functional deficits with objective physical examination findings being noted, [she] was working with these deficits until [June 5, 2002]." (*Id.*) He was "cognizant of the fact that ergonomic issues need to be made to ensure that [she] has a good working environment" and noted that "[she] can work from her home . . . assum-

ing a proper ergonomic workstation exists." (*Id.*) He determined that most of her problems "could be solved by administrative or ergonomic corrections" and stated that "the employer indicates that clerical help is available for her." (*Id.*) To him, "[t]he issues appear to be more in accommodating [Wuollet's] medical condition and its gradual deterioration rather than a true disability issue." (*Id.*) He concluded that "[t]he records fail to indicate a functional impairment such that [she] could not continue performing her usual job duties from [June 5, 2002] going forward with reasonable administrative and ergonomic accommodations." (*Id.* at 241.)

On February 7, 2003, Wuollet provided Continental with a 5–page letter from Dr. Brutlag dated February 5, 2003. Dr. Brutlag stated, in part:

> Judy over the past two years experienced steady progression in her symptoms and a decrease in functional status. She has developed increasing pain in her lower back, knee, neck and shoulders, and increased generalized fatigue....
>
> Judy's greatest problem continues to be fatigue and weakness....
>
> .... She notes increased pain in association with grasping, gripping and lifting activities, and more and more marked fatigue. She has been requiring more and more frequent short rest periods throughout the day....
>
> .... She has been straightforward with her complaints and has, in my opinion, very clear [PPS]. This has been documented by EMG and has been followed for a number of years by multiple physicians.
>
> It is my opinion that Judy's [PPS] progressed to the point where she became totally and completely disabled by June 11, 2002....

> It is my opinion that her weakness is likely to continue to progress. It is my opinion that Judy is totally and completely disabled, that her impairment is severe and disables her from both her usual and customary job and from any substantial gainful employment. She has had a slow and steady decrease in strength, increase in fatigue, increase in pain, and decrease in endurance over the last several years.
>
> *There is no specific event that caused her to suddenly become disabled; her disability is a gradual process that is clearly documented in the medical record and has occurred gradually over a period of years. This is consistent with what we know of [PPS]....*

(*Id.* at AR 255–56 (emphasis added).)

Continental sent Dr. Brutlag's letter to Dr. Gerstenblitt for review. On February 13, 2003, Dr. Gerstenblitt issued his second report. (*Id.* at AR 275.) He stated that Dr. Brutlag's letter did not change his initial opinion. He "fails to see how [Wuollet] goes from working her essential job functions to being 'totally and completely disabled by June 11, 2002.'" He further opined, "At this point, it should not be considered an 'all-or-nothing' type of situation. *Most of the issues in this case appear to revolve around accommodations that may be needed by [Wuollet] perhaps in terms of reduced work-load, amount of hours working* or other administrative issues as mentioned in the initial [report] and then a determination made by the employer of whether they can accommodate these issues." (emphasis added).[4] He concluded that "the additional medical information presented fails to present any new medical conditions that may be contributing to her functional abilities such

---

4. There is no evidence that RSKCo contemplated providing the "accommodations" Dr.

Gerstenblitt envisioned.

that she could not continue to work *in some capacity.*" (emphasis added).[5]

On February 20, 2002, Wuollet sent Continental an updated 68-page medical and work history summary with attached medical records. (*See id.* at AR 276–418.)

### VI. Short–Term Disability Appeal Denied

On March 6, 2003, Continental denied Wuollet's appeal. The denial letter noted that her job required "travel[ing] to visit clients, physicians and medical facilities." (Mohs Aff. Ex. A at AR 429.) But the letter also noted that "Ms. Wuollet's employer ... states that her job is very sedentary and that no travel is required ... [and that] [h]er work is self paced." (*Id.* at AR 430.) It further stated that RSKCo "can accommodate a home environment ... and any files that need to be lifted or carried can be accommodated or assisted by staff." (*Id.*)

Having reviewed Wuollet's claim, Continental found that "[t]he information presented shows that Ms. Wuollet has multiple complaints and symptoms that have been present for several years, but did not preclude her from working" and determined that "[t]he physical findings presented from 2001 to 2002 have been similar, and do not show any significant decline or deterioration that would render Ms. Wuollet functionally impaired from performing the substantial and material duties of her occupation...." (*Id.*) Continental concluded:

> [W]e are not disputing Ms. Wuollet's medical conditions or need for ongoing treatment, but the evidence does not support a functional loss that would prevent Ms. Wuollet from performing the substantial and material duties associated with her regular occupation *on a full-time basis* beyond September 27, 2002. Therefore, we find that the Company's decision of September 26, 2002 remains as proper and correct based on the evidence presented.

(*Id.* (emphasis added).)

On March 8, 2003, Wuollet sent Continental an electromyograph ("EMG") report from January 1994, which noted that her EMG was "abnormal" and was "consistent with post-polio changes." (*Id.* at AR 448, 457.) She also provided a notice from the Social Security Administration that her application for disability benefits had been approved. (*Id.* at 448–49, 461–64.) On March 10, 2003, Continental acknowledged receipt of these documents, but said that its decision was unchanged. (*Id.* at AR 466.)

### VII. Long–Term Disability Denied and Long–Term Disability Appeal Denied

On February 20, 2003, Wuollet applied for long-term disability benefits. (Mohs Aff. Ex. A at AR 277.) She based her long-term disability claim on the record developed during her claim for short-term disability benefits. (*Id.*) On March 21, 2003, Continental denied her long-term disability claim because she was not continuously disabled during the short-term disability period or during the 180–day elimination period. (*Id.* at AR 483–84.) On April 4, 2003, Wuollet's appeal was denied for the same reasons. (*Id.* at AR 491.)

### VIII. Wuollet Submits Additional Medical Information

On July 14 and September 23, 2003, Wuollet sent Continental additional information, including an updated 75–page

---

**5.** Dr. Gerstenblitt does not conclude that Wuollet could continue to work in her regular occupation.

medical and work summary, along with 576 pages of medical records and articles on PPS. (*See* Mohs Aff. Ex. A at AR 1153.) Among these records were Dr. Brutlag's notes from Wuollet's visits on April 15, 2003, and July 15, 2003. The April note stated that Wuollet "has a history of [PPS]"; "[has] increased pain in her neck, shoulder, and upper back ... and increased discomfort in her right hip and back"; "has quite marked weakness throughout her lower extremities"; and "exhibits fairly marked weakness in hip extension." (*Id.* at AR 1087–89.) The July note stated that she reported increased discomfort and constant pain in her right shoulder and neck. (*Id.* at AR 1134.)

Also included was a 1996 sleep study conducted to evaluate Wuollet's daytime fatigue. (*Id.* at AR 686–88.) The study revealed that she awoke 92 times in one night, which the physician believed was "secondary to the pain and discomfort associated with musculoskeletal problems associated with her previous diagnosis of polio." (*Id.* at AR 686.)

Continental sent the additional information to Dr. Gerstenblitt for a third review. On November 6, 2003, Dr. Gerstenblitt issued his third report and noted that he "again failed to see a specific reason why [Wuollet] suddenly stopped fully working on [June 5, 2002]." (*Id.* at AR 1174.) He stated that "[i]n sum, the additional records ... again fail to answer *the main issue at hand*. That is, why [she] was working and then stopped working." (*Id.* at AR 1175 (emphasis added).) He further stated that "[t]he records indicate that [her] lower extremity and possibly back

symptoms have been present for at least 10 years and the claimant was presumably working during that time. While the symptoms in the lower extremities may have subjectively progressed somewhat, they do not interfere with her being able to perform at least some tasks at work." (*Id.*) He concluded that "the additional records fail to change [my] main opinion regarding this case. [I] fail[ ] to see why [she] could not continue to work *in some capacity in a self-paced job from [June 5, 2002] going forward assuming reasonable administrative or ergonomic requests could be accommodated.*" (*Id.* (emphasis added).) [6]

## IX. Final Denial of Short–Term Disability and Long–Term Disability

On November 24, 2003, Continental reaffirmed its decisions to deny Wuollet's claims for short-term and long-term disability benefits:

> The additional information had been submitted for a medical consultant's review, and our conclusion remains unchanged.... We are not disputing Ms. Wuollet's symptoms or complaints, but the medical findings do not support a functional loss or impairment that would have prevented Ms. Wuollet from performing the substantial and material duties of her regular occupation beyond September 27, 2002.

(Mohs Aff. Ex. A at 1169–70.) [7]

## X. Litigation

On February 4, 2004, Wuollet initiated this lawsuit. Counts I and II seek past due short-term and long-term disability benefits and reinstatement of long-term

---

6. There is no evidence of so-called administrative or ergonomic "requests" being made, or whether they would be provided. Additionally, Dr. Gerstenblitt did not conclude that Wuollet could continue to work in her regular occupation, with or without accommodations.

7. This passage is strikingly similar to what Continental wrote in its March 6, 2003, denial letter, except, inexplicably, Continental dropped the words "on a full-time basis" at the end.

benefits. (*See* Am. Compl. ¶¶ 27–34.) Counts III, IV, and V seek certain injunctive relief. (*See id.* ¶¶ 35–49.) Count VI seeks attorneys' fees and costs. (*Id.* ¶¶ 50–52.) The cross-motions for summary judgment followed.

## Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 224 F.3d 735, 738 (8th Cir.2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. *See Graves v. Arkansas Dep't of Fin. & Admin.*, 229 F.3d 721, 723 (8th Cir.2000); *Calvit v. Minneapolis Pub. Schs.*, 122 F.3d 1112, 1116 (8th Cir.1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *See Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995).

## Analysis

### I.  *ERISA Standard of Review*

■ An ERISA plan participant may bring a civil suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Where a plan gives the plan (or claim) administrator "discretionary authority to determine eligibility for benefits," the Court generally reviews the administrator's decision for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Here, while the parties dispute which disability "plan" controls, the Court will assume that the operative plan provides Continental discretionary authority to determine Wuollet's eligibility for both short-term and long-term disability benefits and will therefore review Continental's decision for abuse of discretion.[8]

Under this deferential standard, the Court will uphold Continental's decision if it is reasonable, that is, if it is supported by "substantial evidence." *House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir.2001); *see Donaho v. FMC Corp.*, 74 F.3d 894, 899–900 (8th Cir.1996), *abrogated in part* by *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Substantial evidence is " 'more than a scintilla but less than a preponderance.' " *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1162 (8th Cir. 1998) (quoting *Donaho*, 74 F.3d at 900 n. 10). As long as Continental's "findings are reasonable, they may not be displaced on review even if the court might have reached a different result had the matter been before it de novo." *Donaho*, 74 F.3d at 900 (citation and internal quotation omitted). Ultimately,

---

8. Although conflicts of interest or the existence of procedural irregularities in Continental's decision may prompt a more searching review, *see Woo v. Deluxe Corp.*, 144 F.3d 1157, 1162 (8th Cir.1998), it is unnecessary to address Wuollet's argument for heightened scrutiny, as Continental's decision is unsupportable under abuse-of-discretion review.

[Continental's] decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision. Put another way, [Continental's] decision need not be the only sensible interpretation, so long as its decision offer[s] a reasoned explanation, based on the evidence, for a particular outcome.

*Id.* at 899 (emphasis in original) (citations and internal quotations omitted). The reasonableness of Continental's decision can be determined by both the quantity and the quality of the evidence supporting it. *Id.* at 900.

## II. Application of the Abuse of Discretion Standard

██ Upon review of the entire administrative record, the Court finds that substantial evidence does not support Continental's decision to deny Wuollet's claim for short-term disability benefits.[9] As discussed below, both the quantity and the quality of the evidence supporting Continental's decision is sorely lacking.

To start, the evidence of Wuollet's disability is overwhelming. It is well-documented that due to PPS she experienced a slow and steady decrease in strength, decrease in endurance, increase in fatigue, and increase in pain, which progressed to the point where she was unable to work. In 1993, Dr. Hoppe diagnosed Wuollet with PPS. (Mohs Aff. Ex. A at AR 581.) As noted above, PPS is a slowly progressing syndrome found in polio survivors which causes fatigue, weakness, pain, and muscle cramps and twitches. (*See id.* at AR 1056, 1094–1105, 1113–21); *Abram,* 395 F.3d at 884 n. 2. In 1994, Wuollet had an "abnormal" EMG that was "consistent with post-polio changes." (Mohs Aff. Ex.

A at AR 457.) In 1996, a sleep study revealed that Wuollet awoke numerous times during the night due to pain and discomfort associated with polio. (*Id.* at AR 686.) In 1999, Dr. Seizert observed that Wuollet complained of back and leg spasms and pain in her right knee. (*Id.* at AR 79.)

Then, from September 2001 through July 2003, Dr. Brutlag documented a consistent increase in Wuollet's levels of weakness, fatigue, and pain, which led her to conclude that Wuollet was disabled and unable to work:

- **September 5, 2001**—Dr. Brutlag observed that although Wuollet was doing well, she "note[s] discomfort in her low back and right hip region" and "is gradually experiencing more and more fatigue." (*Id.* at AR 797–98.)

- **February 12, 2002**—Dr. Brutlag reported that Wuollet's "pain has increased," that she has "pain and spasm in her back more consistently," and "notes considerable increase in her pain level and fatigue by the end of a work week." (*Id.* at AR 809–11).

- **March 5, 2002**—Dr. Brutlag noted that Wuollet was "having more difficulty coping with her pain" and had "increased symptoms in association with sitting, particularly driving a car, walking more than a block and a half, and static standing." (*Id.* at AR 818–19.)

- **June 11, 2002**—Dr. Brutlag noted that Wuollet reported "that her symptoms have escalated since I last saw her" and that "she is gradually becoming more and more fatigued." (*Id.* at AR 820.) Dr. Brutlag opined that Wuollet was "at this point disabled due

---

9. Because Continental's denial of Wuollet's claim for long-term disability benefits depended on its denial of her claim for short-term disability benefits, the Court also finds that substantial evidence does not support that decision.

to her [PPS] with progressive weakness and her osteoarthritis" and that "she has been struggling for years with her progressive fatigue, pain, and weakness, and I think has hit the point where she is unable to continue with productive employment at this point." (*Id.* at AR 821.)

- **July 10, 2002**—Dr. Brutlag told Continental that Wuollet suffered from progressive weakness, fatigue, and muscle atrophy. (*Id.* at AR 3.) Dr. Brutlag noted that "for many years [she] has become progressively worse" and that she was unable to do her job and was unable to work from home. (*Id.*)

- **July 23, 2002**—Dr. Brutlag noted that although Wuollet reported feeling slightly better since being off from work, she fatigued easily and had substantial limitations in her ability to sit, stand, or walk for extended periods of time. (*Id.* at AR 53.) Her pain increased in association with static standing, distance walking, lifting, and carrying anything over ten pounds. (*Id.*)

- **September 10, 2002**—Dr. Brutlag noted that Wuollet experienced pain associated with static sitting, static standing, and distance walking, as well as increased pain in her neck, shoulder, right arm, and lower back. (*Id.* at AR 211.)

- **February 5, 2003**—Dr. Brutlag wrote:

  "Judy over the past two years experienced steady progression in her symptoms and a decrease in functional status. She has developed increasing pain in her lower back, knee, neck and shoulders, and increased generalized fatigue. . . .

  "It is my opinion that her weakness is likely to continue to progress. It is my opinion that Judy is totally and completely disabled, that her impairment is severe and disables her from both her usual and customary job and from any substantial gainful employment. She has had a slow and steady decrease in strength, increase in fatigue, increase in pain, and decrease in endurance over the last several years. . . .

  "There is no specific event that caused her to suddenly become disabled; her disability is a gradual process that is clearly documented in the medical record and has occurred gradually over a period of years. This is consistent with what we know of [PPS]. . . ." (*Id.* at AR 255–56.)

- **April 15, 2003**—Dr. Brutlag found that Wuollet "has a history of [PPS]"; "[has] increased pain in her neck, shoulder, and upper back . . . and increased discomfort in her right hip and back"; "has quite marked weakness throughout her lower extremities"; and "exhibits fairly marked weakness in hip extension." (*Id.* at AR 1087–89.)

- **July 15, 2003**—Dr. Brutlag noted that Wuollet reported increased discomfort and constant pain in her right upper shoulder and neck. (*Id.* at AR 1134.)

Notably, Continental does not dispute Wuollet's condition, symptoms, or complaints. (*Id.* at AR 430, 1169.) Nor does Continental suggest that Wuollet's physicians' opinions are unreliable.

Despite the evidence supporting Wuollet's disability claim, Continental denied her disability benefits. Continental's March 6, 2003, denial letter stated that although Wuollet exhibited her symptoms for several years, they "did not preclude her from working" and that her medical records "do not show any significant decline or deterioration" in her condition.

(*Id.* at AR 430.) It concluded that "the evidence does not support a functional loss that would prevent [her] from performing the substantial and material duties associated with her regular occupation on a full-time basis." (*Id.*) Similarly, its November 24, 2003, final denial letter asserted that "the medical findings do not support a functional loss that would have precluded Ms. Wuollet from working." (*Id.* at AR 1170.)

In support of its summary judgment motion and its decision to deny benefits, Continental relies on three sources of information: (1) Gail Russell's Physical Demands Analysis; (2) Nurse Tegelhutter's "functional analysis"; and (3) Dr. Gerstenblitt's reports. (*See* Defs.' Mem. in Supp. at 23–28; Audio Tape: Oral Argument (2/3/05).) Upon close examination, the Court finds the quantity and quality of this evidence to be far from the "substantial evidence" needed to uphold Continental's decision. *See House*, 241 F.3d at 1048; *Donaho*, 74 F.3d at 899.

Beginning with the Physical Demands Analysis, Russell stated that Wuollet's job required no travel, was self-paced, and that office staff could assist her in lifting medical records. (Mohs Aff. Ex. A at AR 40–41.) But the job descriptions supplied by RSKCo and Wuollet paint a different picture. For example, RSKCo's description, which was attached to Russell's Analysis, stated that Wuollet's job required "travel[ing] to visit clients, physicians and medical facilities as needed or required" and the ability to work "in a fast-paced environment." (*Id.* at 42.) Wuollet's job description stated that she was required to travel, bill 150 hours per month, and work without support staff. (*Id.* at AR 141.) Wuollet also pointed out the inaccuracies of Russell's description. (*Id.* at AR 190.) Although Continental was confronted with conflicting information, there is no indication that it investigated which job description was accurate. Instead, its March 6, 2003, denial letter appears to rely upon Russell's description, which portray's Wuollet's job in the least strenuous light. (*See id.* at AR 429–30.) This lack of investigation and the reliance upon the least strenuous description undermines the quality of Continental's decision.

Russell's Analysis also vaguely mentioned that RSKCo "can accommodate [Wuollet's] home environment." (*Id.* at AR 40.) On the fax cover sheet accompanying the Analysis, Russell stated that "[Wuollet's] job can also be accommodated in her home environment if that is acceptable to her physician as well." (*Id.* at AR 39.) But there is no evidence in the administrative record as to what these accommodations were, how they would be implemented, if they were feasible, or whether they were discussed with Wuollet or her physicians. Moreover, Wuollet told Nurse Tegelhutter that her home was not set up for work and that it lacked space (*id.* at AR 71) and Dr. Brutlag told Continental that it was her opinion that Wuollet could not perform her job from home (*id.* at AR 3). As will be seen below, however, the assumption that Wuollet could be accommodated—including working from home—played a central role in Nurse Tegelhutter's "functional analysis" and Dr. Gerstenblitt's reports.

With respect to Tegelhutter's "functional analysis," there are several problems that diminish the quality of her observations. First, as noted above, she was told that Wuollet had been "offered to work out of home," but there is no evidence that any such offer was made. (*Id.* at AR 66.) Second, she was specifically told to pay attention to Wuollet's hands and upper body, but Wuollet's problems were not so limited. (*Id.*) Third, the nearly incomprehensible instructions provided to Tegelhutter only opaquely describe her objectives.

(*See id.*) Fourth, she spent only one hour with Wuollet and was restricted to evaluating how she functioned at home (*id.* at AR 70), but such a limited examination hardly provides a reasonable picture of Wuollet's overall condition or her ability to perform her job. *See Mullally v. Boise Cascade Corp. Long Term Disability Plan,* 2005 WL 66070, at *7 (N.D.Ill. Jan. 11, 2005) ("[W]hether Plaintiff is able to do light household chores is not determinative of whether Plaintiff can work full-time." (citation omitted)). Fifth, there is no evidence in the record as to Tegelhutter's experience and training with respect to PPS. Finally, Tegelhutter made no conclusions on whether Wuollet was disabled.

With respect to Dr. Gerstenblitt's reports, there are also several problems that diminish the quality of his conclusions. First, like Tegelhutter, he was erroneously instructed that Wuollet "has the ability to work from home." (*Id.* at AR 238.) This faulty information caused him to speculate on what accommodations could be made. These speculations played a prominent role in his reports. For example, his first report (January 27, 2003) states that "[t]he notes indicate that [she] can work from home" and "[t]he issues appear to be more in accommodating [Wuollet's] medical condition ... rather than a true disability issue"; his second report (February 13, 2003) states that "[m]ost of the issues in this case appear to revolve around accommodations that may be needed by [Wuollet] in terms of reduced work-load, amount of hours working ... and ... whether

[RSKCo] can accommodate these issues"; and his final report (November 6, 2003) states that he "fails to see why [Wuollet] could not continue to work in some capacity in a self-paced job ... assuming reasonable administrative or ergonomic requests would be accommodated."[10] (*Id.* at AR 241, 275, 1175). But without accurate information regarding what accommodations could be made or Wuollet's ability to work from home, Dr. Gerstenblitt's conclusions are tainted and unreliable.[11]

Second, there is no evidence in the record as to Dr. Gerstenblitt's training or experience with respect to PPS. While he is board-certified in internal medicine and occupational medicine, his PPS expertise is unknown. Wuollet's claim, however, "should be reviewed by a practitioner with sufficient training and experience to competently address the claims at issue." *Sexton v. Deloitte & Touche LTD. Plan,* 2003 WL 1701382, at *7 (D.Minn. March 27, 2003) (Kyle, J.) (citing *Woo,* 144 F.3d at 1161); *see also Morgan v. UNUM Life Ins. Co.,* 346 F.3d 1173, 1178 (8th Cir.2003) (finding physician's opinion was not substantial evidence because, in part, the administrative record did not reveal the physician's expertise or experience in dealing with the ailment at issue). Dr. Gerstenblitt's questionable experience is illustrated by his inability to see "any reason why [Wuollet] suddenly stopped working"; "how [Wuollet] goes from working ... to being" disabled; or "a specific reason why [Wuollet] suddenly stopped fully working." (Mohs Aff. Ex. A at AR 240, 275, 1174.)

10. Looking closely at the final report, Dr. Gerstenblitt never actually gives an opinion as to whether Wuollet was able to perform her regular occupation. Instead, he opined that he "fails to see why [Wuollet] could not continue to work in *some capacity in a self-paced job* ... assuming reasonable [accommodations]." (Mohs Aff. Ex. A at AR 1175 (emphasis added).) One can only imagine what job he's talking about—"some capacity in a self-

paced job" does not accurately describe Wuollet's position.

11. While Dr. Gerstenblitt speculated that Wuollet could work reduced hours, and Continental relied on his opinion in making its decision, Continental ultimately rejected Wuollet's claim because it found that the evidence failed to show that she could not work "on a *full-time* basis." (Mohs Aff. Ex. A at AR 430·(emphasis added).)

Apparently, he was searching for some event that caused Wuollet's disability and it seems that nothing short of such an event would have convinced him that she was disabled. But, as Dr. Brutlag stated, "[t]here is no specific event that caused [Wuollet] to suddenly become disabled; her disability is a gradual process ... occurr[ing] gradually over a period of years ... [which] is consistent with what we know of [PPS]." (*Id.* at AR 256.) The medical literature in the record supports Dr. Brutlag's view that PPS is a slowly progressing syndrome. (*See id.* at AR 1056, 1094–1105, 1113–21.)

Third, Dr. Gerstenblitt appears troubled that Wuollet was able to work so long with her condition. For example, his first report commented that while she had "lower extremity functional deficits," she "was working with these deficits until [June 5, 2002]"; his second report noted that he "failed to see how [she] goes from working her essential job functions to being [disabled]"; and his final report stated that her symptoms have been present for at least ten years, but she "was presumably working during that time." (*Id.* at AR 240, 275, 1175.) But, as the Seventh Circuit recognized: "Some people manage to work [with a disability] for months, if not years, only as a result of superhuman effort, which cannot be sustained.... Reality eventually prevails, however, and limitations that have been present all along overtake even the most determined effort to keep working." *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan,* 195 F.3d 975, 983 (7th Cir.1999). It is doubtful that Wuollet's status as a full-time employee up to June 2002 is evidence that she was able to perform the material and substantial duties of her regular occupation after June 2002. *See Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321, 1326 n. 6 (11th Cir.2001).

Fourth, and perhaps contributing to the problems noted above, Dr. Gerstenblitt never examined Wuollet in person. Rather, each of his reports was based upon a review of a paper record. But a paper record provides poor evidence of Wuollet's weakness, fatigue, and pain, which were her primary symptoms. *See, e.g., Haberman–Hall v. Continental Assurance Co.,* 2003 WL 1883345, at *3 (D.Minn. April 4, 2003) (Magnuson, J.)

Finally, Dr. Gerstenblitt repeatedly stated that Wuollet's medical records did not support her claim. For example, his January 27, 2003, report commented that "[t]he records fail to indicate a functional impairment such that [she] could not continue performing her usual job duties"; his February 13, 2003, report noted that "the additional medical information presented fails to present any new medical conditions that may be contributing to her functional abilities such that she could not continue to work in some capacity"; and his November 6, 2003, report stated that "the additional records ... again fail to answer the main issue at hand. That is, why [she] was working and then stopped working." (*Id.* at AR 241, 275, 1175.) But it was well-documented by Wuollet's physicians that she experienced a slow and steady decrease in strength, decrease in endurance, increase in fatigue, and increase in pain, which led Dr. Brutlag to conclude that Wuollet was disabled and could not work. Given this evidence, Dr. Gerstenblitt's conclusions are inexplicable.[12]

12. Continental relies on *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 880 (9th Cir.2004), where the Ninth Circuit upheld the denial of benefits. That case is distinguishable because, unlike the present case, the plan administrator in *Jordan* had only "conclusory statements from [the claimant's] doctors that she was disabled" and had "relatively more thorough and careful opinions from the plan's doctors" that she was not disabled. *Id.* at 880. In addition,

Continental is "not free to accept [Dr. Gerstenblitt's] report[s] without considering whether [his] conclusions follow logically from the underlying medical evidence." *Abram*, 395 F.3d at 887. There is no indication, however, that Continental considered whether his conclusions followed logically from the evidence; rather, it appears that it blindly accepted his conclusions hook, line, and sinker. Moreover, Continental appears to have given Wuollet's treating physicians' opinions no weight, yet there is no suggestion that their opinions are unreliable. While Continental was not required to automatically accord special weight to Wuollet's physicians' opinions, it "may not arbitrarily refuse to credit [Wuollet's] reliable evidence," including those opinions. *Black & Decker*, 538 U.S. at 834, 123 S.Ct. 1965.

In sum, the quantity and quality of the information upon which Continental relied to deny Wuollet benefits did not amount to substantial evidence. As noted by the Eighth Circuit: "[W]here the administrative decision lacks support in the record, or where the evidence in support of the decision does not ring true and is so overwhelmed by contrary evidence, the administrative decision is unreasonable and will not stand." *Donaho*, 74 F.3d at 901. Such is the case here.[13]

█ Finally, Wuollet requests "reimbursement . . . through December 2004 for

the payment of COBRA [Consolidated Omnibus Budget Reconciliation Act] benefits." (Pl.'s Reply Mem. at 6.) She supports her claim by providing invoices for COBRA expenses that she paid. (*See* Tataryn Aff. in Supp. of Reply Ex. 3.) "COBRA requires plan sponsors of group health insurance policies to provide the opportunity for continuing coverage to beneficiaries who would lose coverage as a result of a qualifying event." *United of Omaha v. Business Men's Assurance Co.*, 104 F.3d 1034, 1041 (8th Cir.1997) (citing 29 U.S.C. § 1161(a)). In this case, the Integrated Disability Program provides that "[i]f you continue to be disabled beyond 26 weeks, your current [health] coverage will continue for up to 29 months, as provided under [COBRA], *and will be paid entirely by RSKCo.*" (Mohs Aff. Ex. A at AR 1204 (emphasis added).)

Continental responds that Wuollet's COBRA claim is not properly pled. (*See* Defs.' Mem. in Opp'n at 24.) The Court disagrees. Wuollet alleged that

RSKCo/Continental policies provided that while an employee is paid STD benefits, the employee continues to participate in other benefit plans including medical, dental, [and] vision.... The policies further provided that if an employee is eligible for and receives LTD benefits, the employee is eligible for 29

---

the plan administrator in *Jordan* referred the claim to a specialist, *id.* at 881, whereas there is no evidence of Dr. Gerstenblitt's training and experience with PPS.

13. Continental has, during the briefing and oral argument for the motions, raised the lack of objective medical evidence and functional capacities examinations as additional reasons for rejecting Wuollet's claim. But Continental never asserted these in its denial letters as reasons for its decision. Under ERISA, a claim denial must be written "in a manner calculated to be understood by the claimant" and contain "[t]he specific ... reasons" for

the denial. 29 C.F.R. § 2560.503–1(g)(1)(i); *see* 29 U.S.C. § 1133(1). Courts "are free to ignore ERISA plan interpretations that did not actually furnish the basis for a plan administrator's benefit decision" as communicated to the plan participant. *Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir.1998) (citation omitted). Because any other approach would allow claimants to be "sandbagged by after-the-fact plan interpretations devised for purposes of litigation," *id.*, the Court will "not consider [Continental's] post hoc rationales," *Conley v. Pitney Bowes*, 176 F.3d 1044, 1049 (8th Cir.1999).

months of company paid COBRA benefits.

(Am.Compl.¶ 13.) She further alleged that she "is entitled to judgment against Defendant for reinstatement in the LTD Plan, retroactive and ongoing benefits ... and other attendant employee benefits...." (*Id.* ¶ 34.) These allegations are sufficient under Rule 8 of the Federal Rules of Civil Procedure to provide RSKCo with sufficient notice of Wuollet's COBRA reimbursement claim. *See, e.g., Northern States Power Co. v. Fed. Transit Admin.,* 358 F.3d 1050, 1056–57 (8th Cir.2004) (citing Rule 8(a) and stating that "[t]he essential function of notice pleading is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved" (citation and internal quotations omitted)). Because Wuollet was disabled beyond 26 weeks, and continues to be disabled, she is entitled under the Integrated Disability Program to have her COBRA insurance paid by RSKCo for up to 29 months. (*See* Mohs Aff. Ex. A at AR 1204.)[14]

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED:**

■ 1. Plaintiff's Motion for Summary Judgment (Doc. No. 22) is **GRANTED;**

  a. Wuollet is awarded past-due short-term and long-term disability benefits and prejudgment interest;[15]

  b. Continental shall reinstate Wuollet in its long-term disability plan as a participant entitled to benefits under the plan;

  c. Continental shall reimburse Wuollet for the payment of COBRA expenses through December 2004;[16] and

14. As a final matter, Wuollet seeks certain equitable relief under 29 U.S.C. § 1132(a)(3), which provides that an ERISA plan participant may bring a civil suit "(A) to enjoin any act or practice which violates any provision of this subchapter ... or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter...." Wuollet argues that the Integrated Disability Program, which she views as the operative disability plan, does not comply with several ERISA requirements and seeks Continental's compliance. She identifies those requirements as (1) identifying the plan's fiduciaries and providing procedures for operating, administrating, and amending the plan, as required under 29 U.S.C. § 1102; (2) describing, in future denial letters, any additional materials or information necessary for her to perfect her claim and an explanation of why such materials or information is necessary, as required under 29 C.F.R. § 2560.503–1(g); and (3) providing a summary plan description, as required under 29 U.S.C. § 1022 with the information detailed in 29 C.F.R. § 2520.102–3. (*See, e.g.,* Pl.'s Mem. in Supp. at 27–28.) As noted above, *see supra* n. 1, the Court does not decide which plan—the Integrated Disability Program, the Short Term Disability Plan, or the Long Term Disability Policy—is the operative plan in this case. Nevertheless, the Court will assume that Continental will comply with the above-mentioned ERISA requirements going forward without a court order and will provide Wuollet the information she requests within 30 days.

15. Prejudgment interest is appropriate because (1) Continental "has continued to have use of th[e] money," (2) "the exact amount of liability on the plan[] was never in issue," and (3) "an award of prejudgment interest is necessary in order ... [to] obtain 'appropriate equitable relief.'" *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1219 (8th Cir. 1981) (quoting 29 U.S.C. § 1132(a)(3)(B)).

16. Should Wuollet move for attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g), that motion must be made in accordance with the time limits set forth in Local Rule 54.3. If filed, the motion shall be accompanied by a memorandum, affidavit, and supporting documents. The Court will provide Continental with an opportunity to respond.

2. Defendants' Motion for Summary Judgment (Doc. No. 18) is **DENIED.**

**LET JUDGMENT BE ENTERED AC-CORDINGLY.**